**EXHIBIT 1**

FILED

DEC 0 7 1999

STATE BAR COURT CLERK'S OFFICE
SAN FRANCISCO

CONFIDENTIAL

## THE STATE BAR COURT
### HEARING DEPARTMENT · SAN FRANCISCO

| | | |
|---|---|---|
| In the Matter of | ) | Case No. 99-M-10079 NRL |
| SIMON S. LEVI | ) | DECISION |
| Applicant for admission | ) | |

INTRODUCTION:

This confidential matter comes before the Court on an application for admission to the practice of law, filed by Applicant Simon S. Levi (Applicant.) Applicant is represented by Jerome Fishkin, Esq.; the Committee of Bar Examiners (Committee) is represented by Deputy Trial Counsel Donald Steedman. Trial was held September 21. 28, 29. 30, October 1, 5 and 7, 1999. The matter stood submitted following briefing, on November 9. 1999.

1

The issue is whether Applicant has present good moral character, sufficient to justify his admission to practice law. After the necessary prima facie showing of present good character by Applicant, the Committee conclusively proved that, for several years during the 1990's, while attending law school, Applicant engaged in extensive and improper litigation, and in violent criminal behavior. He also displayed a lack of candor in his moral character application, and in other matters preceding this hearing. Clearly, his actions were not those of a person with the requisite good moral character to practice law in California.

Applicant now contends 1) that his misconduct was not so serious as the Committee portrays it; and 2) that he has shown sufficient rehabilitation to now be admitted to practice.

The Court is unable to accept Applicant's arguments at this time. The Court does view Applicant's previous misconduct as very serious, and believes that Applicant fails to appreciate just how serious it was, or to honestly admit his mistakes. His efforts at rehabilitation are recent and remain unfinished. Therefore, the Court is unable to certify Applicant's good moral character at this time.

PRIMA FACIE SHOWING OF GOOD MORAL CHARACTER:

Legal Standard:

This Court may recommend the admission of an applicant who is certified to be of good moral character. (See section 6060(b) of the Business and Professions Code.) "Good moral character" is defined to include "qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, knowledge of the laws of the state and the nation and respect for the rights of others and the judicial process." (rule X, section 1(a) of the Rules Regulating Admission to Practice Law in

2

California.) "The ultimate issue in these proceedings is whether we have faith, based on the evidence before us, that petitioner will uphold the duties of an attorney--that he will conduct his professional affairs with integrity and in an honest manner that will inspire public confidence in the profession." (Kwasnik v. State Bar (1990) 50 Cal.3d 1061, 1087.)

The initial burden is on Applicant to show present good moral character. (Greene v. Committee of Bar Examiners (1971) 4 Cal.3d 189, 192) This is not a high burden and may be established through the testimony of witnesses familiar with the Applicant's present character and reputation. (Id., and Kwasnik v. State Bar, supra, 50 Cal.3d at 1068.)

Findings of Fact:

Applicant's testimony showed that he was born in Israel, and after graduating from high school, served his requisite time in the military. He was honorably discharged. While living in Israel, Applicant was involved in a number of charitable works.

In 1987, Applicant and his wife moved to Southern California so that she could finish college. Applicant learned English, got his GED, attended college and received a bachelor's degree in economics. In the early 1990's, they moved to San Francisco so that Applicant's wife could attend Hastings College of the Law. In 1993, Applicant decided to attend law school also, and he was admitted to San Francisco Law School.

While in law school, Applicant participated in a charitable fraternity. He also involved himself in other charitable works, such as delivering meals and books to the homebound, donating blood, teaching others to read, and tutoring fellow students. Toward the end of his law school career he volunteered for the pro bono legal Homeless Advocacy Project.

Casandra Neal was a fellow schoolmate at law school, and confirmed

3

1   Applicant's good works, and his pro bono tutoring. She stated that
2   Applicant was very generous with his time, and has a true spirit of giving.
3   She stated that when she first met Applicant, he had an aggressive
4   approach which she felt stemmed from his Israeli background. She feels
5   that Applicant has greatly matured, and is now more mellow and balanced.
6   He is now more patient and able to see both sides of an issue. She highly
7   recommends him as a candidate for the bar.

8   Conclusions of Law:

9       Applicant met his prima facie burden of showing present good
10  character.

11  THE COMMITTEE'S SHOWING OF PAST MISCONDUCT:

12  Legal Standard:

13      The burden then shifts to the Committee to show past misconduct
14  which reflects adversely on Applicant's moral character. (Hightower v.
15  State Bar (1983) 34 Cal.3d 150, 155.) The Committee has raised a number
16  of issues in this regard, which are described below.

17  Findings of Fact:

18  1. The Target Litigation:

19      The Committee first contends that Applicant engaged in frivolous
20  litigation by reason of a lawsuit he filed against Target Stores. In 1993,
21  while attempting to panhandle at a Target Store, Applicant saw a sign
22  which purported to prohibit economic solicitation on its premises.
23  Applicant was asked to leave the premises. Applicant believed this policy
24  and conduct to be a violation of the First Amendment. He filed suit in state
25  court, relying on the authority of Pruneyard Shopping Center v. Robins
26  (1980) 447 U.S. 74, which holds that, under California law, a shopping mall
27  is a public arena for the purpose of expressive speech. After a demurrer

28

1  was filed on the grounds that panhandling was not constitutionally
2  protected speech, Applicant dismissed the suit. (Applicant observed that
3  the sign to which he objected had been removed, and maintains that that
4  was why he dismissed the suit.) Several years later, when he observed a
5  similar sign at a different store, he wrote a letter demanding that it be
6  removed. No legal action followed.

7  2. The Safeway Litigation:

8     In 1993 Applicant was attempting to panhandle in front of a
9  Safeway Store in San Francisco. He was asked to leave the premises by the
10 manager. Applicant called the police, as did the manager. The police
11 advised Applicant to leave.

12    Applicant then brought a civil rights action against Safeway in
13 Federal District Court in San Francisco. Once again Applicant relied on the
14 Pruneyard decision, apparently not understanding that it established
15 rights under California law, not the federal constitution. He attempted to
16 show "state action" by the fact that Safeway sold postage stamps, and by
17 contending that some Safeway stores (although not the one in question)
18 were built on land leased from public entities. He also contended that
19 calling the police department for assistance constituted state action.

20    Applicant's first lawsuit was dismissed for failure to prosecute. He
21 filed and served another lawsuit in 1994. At a hearing on his motion to
22 compel discovery, in July, 1994, the court stayed all discovery pending a
23 motion to dismiss. The court (Hon. Marilyn Hall Patel) expressed its
24 concern that this might be a spurious lawsuit, admonished Applicant, and
25 gave him thirty days to reconsider going forward with the case. In a
26 written order, the Court warned that if Applicant failed to withdraw any
27 spurious claims, and if the court found that no basis existed for the claims,

28

5

sanctions would be imposed. [1]

Defendants (Safeway was represented by the law firm of Dillingham and Murphy) then filed a motion to dismiss, as directed by the court. (They had already provided Applicant with citations to controlling case law, which established that no federal claim was stated under the facts and jurisdictional statutes upon which Applicant relied.) They also gave notice of a motion for sanctions under rule 11 of the Federal Rules of Civil Procedure. The defendants brought a number of issues to the court's attention, including  Applicant's threats of various other lawsuits against Safeway and other Dillingham and Murphy clients; threats to disrupt Safeway's business; Applicant's threat to bring a price-fixing suit against opposing counsel and a court reporter, because Applicant was unhappy with the cost of a deposition transcript; and other improper and harassing behavior.

In a Memorandum and Order issued in  December, 1994, the court found no state action which would permit Applicant's federal claims to go

---

[1]The transcript of the hearing reveals the court's repeated warnings to Applicant:
"If in fact you persist in this lawsuit, you may well find yourself having--being more destitute than you are now, if you are in fact destitute. You may find yourself paying attorneys fees and costs to the other side. Because it looks to me as if, when we get to the bottom of all this, it really is a spurious lawsuit."
"I will give you thirty days to seriously consider withdrawing this lawsuit in its entirety. If you do not, I'm putting you on warning that any claims that are dismissed that I conclude are spurious, and for which there's no basis in fact, or theory in law, I will impose sanctions. And that goes to the State Bar. And you may never get in the door--if you persist in this while you are in law school. You won't have to worry about getting disbarred or suspended, or have some other disciplinary action taken; you won't even get in."

6

forward. It dismissed the case in its entirety. The court also sanctioned Applicant, for his misconduct in bringing a baseless lawsuit, misrepresenting facts[2] and case law to the court, and using the action as a form of harassment, thereby abusing court process and violating rule 11.

Unfortunately this did not end Applicant's participation in the lawsuit. After the case had been dismissed he brought a motion to recuse Judge Patel. He brought a motion for reconsideration. He moved for sanctions against the defendants and their counsel. In an order entered in May, 1995, the court denied Applicant's motions, awarded Safeway $10,782.89 in sanctions, and cautioned Applicant that it would not entertain any other motions.

Applicant appealed to the Ninth Circuit. In a memorandum decision filed August 16, 1996, that court upheld all of Judge Patel's rulings, including the finding that Applicant violated rule 11 by filing claims that were not warranted by existing law and were frivolous.

In early 1999, apparently in preparation for this hearing, Applicant filed an "Application to Reopen the Case in Order to File a Motion to Strike Footnote or Seal Pleadings." This motion starts out "As this Court may recall, approximately six years ago I was a litigious first year law student, who advanced several politically motivated lawsuits against different entities." The purpose of this motion was to ask Judge Patel to strike the

---

[2] In an endnote to its decision, the court stated: "Levi now insists in his moving papers that Safeway called the police. However, Levi's complaint repeatedly alleges that he called the police to effect his citizen's arrest, making no indication that Safeway "also" called the police. Of course, if Levi were a member of the California Bar, any intentional misrepresentation of fact to this court would be a violation of the CAlifornia Rules of Professional Conduct, Rule 5-200(B)."

1   footnote [sic] in which she found that Applicant had made

2   misrepresentations of fact (quoted above at note 2.) Applicant further

3   states: "the footnote [sic] does not accurately set forth the facts, and

4   accuses me of an act of moral turpitude which is now, inter alia, causing

5   me difficulties in my efforts to seek admission to the State Bar."   The court

6   denied Applicant's motion.

7   3. Related Misconduct Toward Dillingham and Murphy:

8       During the course of the Safeway litigation, Applicant developed a

9   serious personal animosity toward the partner, Mr. Dahlberg, and associate,

10  Mr. Martincheck, at Dillingham and Murphy, who were representing

11  Safeway.   The court record is replete with Applicant's telephoned and

12  written insults and accusations against them.

13      In late August, 1995, after the Safeway suit had been dismissed, and

14  while various motions were still pending, Applicant went to the law offices

15  of Dillingham and Murphy. His stated purpose was to serve Mr. Dahlberg

16  and Mr. Martincheck with a complaint filed against them by another in

17  propria persona litigant, Mr. Perlantov, whom Applicant had befriended.

18  At the law firm Applicant acted very inappropriately, entering private

19  areas of the firm, speaking loudly, and intimidating office staff. Mr.

20  Greenberg, a partner who attempted to deal with Applicant, stated that

21  Applicant was loud and agitated, would "not take no for an answer,"   and

22  was scary. Mr. Martincheck appeared to accept service. Applicant

23  demanded identification and attempted to photograph Mr. Martincheck.

24  Mr. Martincheck described Applicant as erratic and angry, and found the

25  incident upsetting, coming only a year or two after the 101 California

26

27

28

1   shooting.[3] Applicant was eventually escorted off the premises by security.

2   The next day Applicant left a threatening telephone message for Mr.

3   Dahlberg, about Applicant's continuing efforts to serve him. ("Johnny. . .if I

4   don't hear from you by Friday at noon, I'm going to actively and

5   aggressively--aggressively looking for you and Mr. Martincheck in order to

6   serve you. . .") This was despite the fact that Mr. Dahlberg's partner had

7   accepted service for him and Mr. Martincheck.

8   Mr. Dahlberg and Mr. Martincheck then moved for and obtained a

9   three year "stay-away" restraining order in Superior Court against

10  Applicant. At the September 1995 hearing concerning the restraining

11  order, the court [Commissioner Loretta M. Norris] cautioned Applicant:

12

13          " . . . you are a law student and you hope to become an
        attorney. . . .
14
            "And, frankly, running around filing a lot of lawsuits is
15      not really going to be very helpful toward your application to
        be admitted to the bar. And I'm concerned about your conduct
16      at the law office, leaving aside the phone calls. I'm not sure it
17      amounts to harassment under the harassment statutes. If it
        continued in any way, it certainly would amount to harassment.
18      But to thrust yourself into areas of the law firm that are not
19      open to the public was totally inappropriate.
            "Apparently, you have been heavily sanctioned by a
20      federal court judge for filing what appears to have been some
21      rather frivolous litigation, and frankly, this type of conduct
        could easily jeopardize your admission to the bar at such time
22      as you apply--."
23

24  Applicant filed a cross-complaint against Mr. Dahlberg and Mr.

25

26  _____

27      [3]The Court understood Mr. Martincheck's reference to be to the tragic
    shooting at the law firm of Pettit and Martin, in the 101 California Street
28  highrise in San Francisco, in July, 1993.

9

1   Martincheck, as well as a number of other defendants. His allegation was

2   that "Mr. Dahlberg and Mr. Martincheck filed this action as part of a course

3   of harassment and intimidation in order to complicate Simon Levi's Moral

4   Character Application with the State Bar of California. . . ." Defendants

5   demurred. Applicant filed an amended complaint; Defendants again

6   demurred. The demurrer was sustained, with leave to amend some counts.

7       Applicant sent Mr. Perlantov to Dillingham and Murphy to serve

8   papers concerning this cross-complaint. Mr. Perlantov was abusive and

9   threatened one of the secretaries at the office. Mr. Dahlberg and Mr.

10  Martincheck then moved to modify the restraining order to preclude

11  Applicant from sending Mr. Perlantov to harass them. The order was so

12  amended by Judge Bea.

13      Applicant appealed from Commissioner Norris's order. After the

14  appeal was filed, he dismissed his cross-complaint. The issuance of the

15  restraining order was affirmed by the Court of Appeal in an unpublished

16  opinion.

17      In early 1997, Applicant attempted to amend the restraining order.

18  The court allowed a minor modification concerning the Plaintiffs' new

19  business address, and denied all of Applicant's other requested

20  amendments. In March 1998, Applicant made a motion to dissolve the

21  restraining order or place it under seal. Those motions were also denied.

22  4. The Criminal Conviction, and Related Litigation:

23      In July, 1996, Applicant was working as a process server.[4] He had an

24

25      [4] The following summary is based upon the credible testimony of

26  Susan Pishgar and Puck, who were the victims of Applicant's assault.

    Applicant's version of events, in which he portrays himself as a victim

27  acting in self-defense, is expressly discredited. Applicant's version of

28  events is implausible, inconsistent, and is undercut by his admission of

                                10

1   assignment to serve unlawful detainer papers on a person residing at 685
2   Fell Street, San Francisco. Instead, he went to a wrong address, 600 Fell,
3   despite the fact that the address on that building was clearly marked.

4       The building at 600 Fell Street has an exterior wrought iron security
5   gate, which opens into a small courtyard. That in turn leads to the front
6   security door, leading to the building lobby. Both gate and door must be
7   unlocked with keys.

8       When Applicant arrived, an apartment resident called Puck was
9   approaching to unlock the gate. As Puck started to enter, Applicant
10  grabbed him by the shoulder and tried to get past. Puck asked Applicant
11  where he thought he was going; Applicant replied that he was a police
12  officer and was coming in.[5] Puck told him if he did not have a key he could
13  not come in. Applicant repeated that he was a police officer, and had
14  business here. Puck told him he needed to talk to the apartment manager.

15      Puck started toward the keypad to buzz the manager, but then saw
16  the manager, Susan Pishgar, and her young daughter, in the lobby. He
17  called to them and they came out the front door, letting it close behind
18  them. All four persons were now in the small courtyard.

19      Applicant repeated that he was a police officer; Ms. Pishgar replied
20  that he was no officer, and asked his business. Applicant then admitted
21  that he was a process server and named the person he was to serve. Ms.
22  Pishgar replied that no one by that name lived in this building. She told
23  Applicant he was trespassing and had to leave, and added that the next

24

25  _____

26  criminal wrong-doing.

27      [5]These are not verbatim quotes. Applicant's comments were laced
28  with profanity which it is unnecessary to repeat.

                              11

1    time Applicant served process he should do it properly.

2        Applicant became enraged and yelled "Bitch, don't tell me how to do
3    my 'job," and pushed Ms. Pishgar against the door. Ms. Pishgar, who is a
4    very small woman, tried to fend off Applicant, who is a much larger
5    person. She may have hit and /or scratched him, and may have knocked
6    his glasses off. Applicant began hitting her with his fists. At one point Ms.
7    Pishgar managed to push Applicant away from her. Applicant then
8    produced a can of pepper spray and sprayed it directly into Ms. Pishgar
9    eyes, ears and throat. Some spray also got on Puck and on Ms. Pishgar's
10   five year old daughter.

11       Ms. Pishgar and her daughter were both screaming. Applicant ran
12   out the gate (which opens from the courtyard side without a key) and ran
13   up Fell Street. Puck pulled Ms. Pishgar into the building lobby. Puck saw
14   Applicant again in front of the building and was able to get his license
15   number before he drove away.  Puck took Ms. Pishgar to her apartment
16   and called 911. At their instruction, he began trying to rinse her with
17   water. Other apartment residents came to help.

18       Both police and ambulance personnel came. Applicant had left the
19   scene to find a phone, from which he states he also called 911. He returned
20   to 600 Fell Street. He declined medical care, and spoke with a police officer.
21   Ms. Pishgar was taken to a hospital and treated. She had serious short-
22   term pain and difficulty breathing, and some lingering medical effects,
23   such as sensitivity to sunlight. She and her daughter were both
24   emotionally traumatized by the incident.

25       Applicant was the subject of a seven-count felony and misdemeanor
26   indictment, alleging use of a deadly weapon, assault against Ms. Pishgar
27   and Puck, and causing harm to a child.

28

He was also civilly sued by Ms. Pishgar, on her own behalf and on behalf of her daughter. Applicant cross-complained against them, and other defendants, alleging assault and battery and negligence. During the course of this litigation, Applicant attempted to videotape Ms. Pishgar's deposition, which further terrified her, threatened to have her arrested, and made other vague threats against her.

Finally, in late 1997, with Ms. Pishgar's consent, all the criminal and civil litigation was concluded in a coordinated settlement. Applicant pleaded nolo contendere to one misdemeanor count of assault, and agreed to pay Ms. Pishgar and her daughter $15,000.00 in damages. He was sentenced to three years probation, with conditions including attendance at an anger management program. He was enjoined from threatening Ms. Pishgar or Puck. Applicant did pay his debt to Ms. Pishgar, and was released from probation early. A motion to dismiss the criminal action pursuant to section 1203.4 of the Penal Code was granted.

5. Lack of Candor:

The Committee contends that Applicant made a misrepresentation in his moral character application with the intent to mislead the Committee. Concerning his sanctions debt to Safeway, Applicant stated "Recently, I received word from Safeway that it has not acted on the judgment as a courtesy to me." What the letter from Safeway's attorneys actually said was "As a courtesy to you, we forebeared for some time on collection of the debt you owe Safeway Inc. . . . . If you would like to propose a payment plan that will quickly liquidate the debt, I await word from you. Otherwise, my client will pursue its remedies." While Applicant's statement on the application is technically true, it is only a half truth, as is tends to mislead the reader into believing that Safeway does not care about collecting the

1    debt. This does evidence a lack of candor.

2        There is other evidence of a lack of complete candor on Applicant's
3    part. Although he claims to acknowledge his wrongdoing in the Pishgar
4    matter, it is clear that he still believes he was the victim in that incident.
5    He continues to allege that this tiny woman, in the company of her small
6    child, attacked him with such ferocity that he had to empty an entire can
7    of pepper spray in her face in self defense. He states that he pled nolo
8    contendere to assault solely because he used excessive force in his self
9    defense. The testimony of family and friends, and Applicant's psychologist,
10   makes it clear that Applicant has viewed himself as the victim of this
11   incident all along. Applicant simply has not been candid about this event
12   with anyone, including himself.

13       Further, other actions which Applicant took in preparation for this
14   hearing reflect a lack of candor. He attempted to seal a part of Judge Patel's
15   order, and the state court restraining order, apparently so those matters
16   could not be used as evidence in this proceeding. Attempting to hide
17   evidence rather than deal with it directly is not a good indication of candor
18   in an applicant for admission to practice law.

19   Conclusions of Law:

20       Applicant argues that the above conduct is simply not serious enough
21   to raise an issue of Applicant's present moral character. Aside from the
22   Target litigation, the Committee has established by clear and convincing
23   evidence that Applicant committed a number of acts, over a period of
24   several years, which were contrary to good morals and showed great
25   disrespect for the rights of others and the legal system.

26   1. The Target Litigation:

27       The Court does not find that the Target lawsuit was frivolous. The

28

14

1    Pruneyard case does establish at least an arguable right, under California
2    law, for expressive speech on some forms of private property. There was
3    some authority at the time that solicitation was a form of expressive
4    speech. (E.g. Blair v. Shanahan (N.D. Ca. 1991) 775 F.Supp. 1315 [later
5    vacated.]) Applicant's position was not wholly unfounded. Further, when
6    the deficiencies in the suit were pointed out, he dismissed the suit rather
7    than continuing the litigation. This incident does not rise to the level of
8    misconduct showing bad moral character.
9    2. The Frivolous Safeway Litigation:
10       The findings of the federal courts in the Safeway matter, that
11   Applicant engaged in frivolous litigation for the purpose of harassment, is
12   binding on this Court. (In the Matter of Berg (Review Dept. 1997) 3 Cal.
13   State Bar Court Rptr. 725; In the Matter of Applicant A (Review Dept.
14   1995) 3 Cal. State Bar Court Rptr. 318; see Operating Engineer's Trust Fund
15   v. A-C Co. (9th Cir. 1988) 859 F.2d 1336, 1344 [frivolous litigation found
16   only on the basis of clear evidence.]) Engaging in frivolous litigation is
17   extremely serious misconduct. (E.g., Weber v. State Bar (1988) 47 Cal.3d
18   492; Light v. State Bar (1939) 14 Cal. 2d 328; In the Matter of Varakin
19   (Review Dept. 1994) 3 Cal. State Bar Court Rptr. 179.)
20   3. The Harassment of Dillingham and Murphy:
21       Applicant engaged in a continuing pattern of harassment against the
22   law firm of Dillingham and Murphy, and its partners and employees. This
23   conduct included rude and threatening letters and telephone messages.
24   This misbehavior culminated in the incident at the law firm concerning the
25   service of process on behalf of Mr. Perlantov. Applicant's behavior was so
26   disturbing that Mr. Dahlberg and Mr. Martincheck found it necessary to
27   obtain a restraining order to protect themselves, their employees and
28

1  families. Applicant's conduct in the course of both the Safeway litigation

2  and his cross-complaint against Mr. Dahlberg and Mr. Martincheck was

3  unprofessional in the extreme.

4      Applicant argues that his conduct was merely the result of "mutual

5  animosity" between Mr. Dahlberg and himself, and acknowledges that he

6  should never have been "taken in" by Mr. Dahlberg's litigation tactics.

7  Behavior of the sort engaged in by Applicant, during the course of

8  litigation, is rude, obnoxious, and violates every concept of civility and

9  professionalism. It is not the type of conduct in which a law student hoping

10 to gain admission to the Bar should engage. (E.g. Rosenthal v. State Bar

11 (1987) 43 Cal.3d 612, at 626,636; In the Matter of Varakin, supra, 3 Cal.

12 State Bar Court Rptr. 179, 190-191.)

13 4. The Pishgar Assault Conviction and Litigation:

14      Applicant's criminal plea conclusively establishes the elements of

15 that crime. (Section 6101(a) of the Business and Professions Code; In the

16 Matter of Stewart (Review Dept. 1994) 3 Cal. State Bar Court Rptr. 152.)

17 The facts and circumstances surrounding Applicant's assault of Ms. Pishgar

18 show that it was unprovoked and extremely cruel. It caused her both

19 physical and emotional damage. Applicant's meritless cross-complaint

20 against her compounded his harm. To this day, Applicant refuses to fully

21 acknowledge the wrongfulness of his actions. An assault of this type is

22 very serious misconduct. (In the Matter of Burns (Review Dept. 1995) 3

23 Cal. State Bar Court Rptr. 406; In the Matter of Stewart, supra.)

24 5. Lack of Candor:

25      Applicant's lack of candor about a number of matters causes this

26 Court grave concern. The law is not a game to be played using dishonesty

27 or deceit. Truthfulness, candor and reliability are at the core of the

28

1  honorable practice of this profession. As was noted above, the Supreme

2  Court requires assurance "that [an applicant] will conduct his professional

3  affairs with integrity and in an honest manner that will inspire public

4  confidence in the profession." (Kwasnik v. State Bar (1990) 50 Cal.3d 1061,

5  1087.)

6  APPLICANT'S CASE IN REHABILITATION:

7  Findings of Fact re Rehabilitation and Present Good Character:

8       Applicant argues, that if his past conduct is found to be wrongful, he

9  is sufficiently rehabilitated that the Court need not be concerned about

10  further misconduct. He points to restitution, and to counseling which he

11  has undergone, to show rehabilitation. He also presented the testimony of

12  several character witnesses who believe that Applicant should be admitted

13  to practice. These, he argues, coupled with his good works, should be

14  sufficient to show present good moral character.

15  1. Restitution

16       As noted above, Applicant paid in full the judgment to which he

17  stipulated in favor of Ms. Pishgar and her daughter.

18       Over the years, Applicant also paid the sanctions to Safeway in a

19  total amount of $10,000. While this does not fulfill the entire sanction, nor

20  provide any interest, Mr. Dahlberg indicated that if all these payments

21  could be verified, Safeway would sign a release of the judgment.

22  2. Psychological Rehabilitation:

23       Dr. Jude Sharpe is Applicant's treating psychologist. Applicant

24  contacted her in January 1997, through the lawyer referral program. He

25  felt at that time that his life was out of control and that he needed to make

26  significant changes to resolve the problematic situations in which he found

27  himself, such as his arrest, the sanctions imposed by the federal court, and

28

1 7

1   the Superior Court restraining order against him.

2       Unlike most treating professionals, Dr. Sharpe was an objective and
3   reliable witness. She has been a licensed clinical psychologist since 1991.
4   She received her doctorate in clinical psychology in 1987. Before becoming
5   a psychologist she was a licensed marriage and family therapist, and she
6   has also worked as a probation officer. Her testimony provided a good deal
7   of insight into Applicant's problems and his ability to cope with them.

8       Dr. Sharpe stated that when Applicant came to her he was terrified.
9   He was very concerned about his arrest in the Pishgar incident. He was
10  distressed and anxious, and alarmed that the arrest would harm his chosen
11  career and his ability to reside in the United States. Her diagnosis of him
12  was chronic adjustment disorder with anxiety and depression.

13      Dr. Sharpe stated that the focus of her work with Applicant has been
14  to get him to gain insight into how his conduct has caused problems for
15  him, and to help him manage his anger so that similar incidents do not
16  occur in the future. She feels that in the course of therapy he has gained
17  insight and understanding. She feels that the therapy, along with the anger
18  management program Applicant attended by reason of his criminal
19  probation, has caused Applicant to be much more able to control his
20  actions when angry. He is greatly improved in this regard.

21      She stated that Applicant has had many stressors in his life: moving
22  from Israel, attending law school, concern about his family in Israel. He is
23  now more able to deal with such stressors. He steps back from conflictual
24  situations, and tries not to provoke conflict with others.  He focuses on
25  understanding why situations upset him, and what he can do to avoid
26  behavior that will get him in trouble.

27      On cross examination, Dr. Sharpe stated that her clinical diagnosis of

28

1 8

Applicant has not changed, although his subset of symptoms has changed somewhat. She finds him less depressed but still anxious. She acknowledged that she was unable to believe everything Applicant told her, particularly about the Pishgar incident. She has never believed that Applicant was the victim, as he originally contended. (She believes that Applicant has made some progress in acknowledging his wrongdoing in the matter.) She also acknowledged that the practice of law was stressful, and stated that whether Applicant's reaction to that stress would be in excess of what could normally be expected is speculative. In the past, he has overreacted to stressors, and he does still have the underlying disorder. It is a matter which is of concern to her.

3. Character Testimony re Rehabilitation and Present Good Moral Character:

Applicant presented four witnesses to attest to his rehabilitation and present good character. (Ms. Neal's testimony is summarized above.) Unfortunately, most of these witnesses did not seem to truly appreciate the wrongfulness of Applicant's past misconduct. Although they had been shown a number of documents revealing the Committee's concerns about Applicant, they seemed to believe that Applicant was the victim in the Pishgar matter, despite his criminal conviction and the civil judgement to which he agreed. Some were unaware of his other legal problems.

A. Victoria Curtis:

Like Ms. Neal, Ms. Victoria Curtis was a fellow student of Applicant's at law school. She worked with Applicant on some charitable projects, and described him as a mentor. She stated that in 1996, Applicant had all kinds of "problems and grief" due to a pepper spray incident while Applicant was serving somebody. He said that he was the one attacked, by a woman; he never mentioned that a child was involved. She stated that this incident

made Applicant more serious and withdrawn. She stated that he was devastated by the whole incident; that he "went through hell" emotionally and physically.    Applicant never admitted guilt in the incident, although he did say he was sorry.

Ms. Curtis was unaware of the sanctions and the restraining order against Applicant, although she knew he was greatly concerned about his ability to get his law license, due to his criminal conviction.

Ms. Curtis does believe that Applicant has good moral character. She has always found him to be honest, and respectful, someone she could trust. She found him to be a great student and teacher. She believes he has learned from his problems, has learned more about the system, and has grown up a lot. She would employ him as an attorney.

B. James Miles:

Mr. James Miles has been an attorney admitted to practice since 1992. He has known Applicant since 1996. Applicant has worked for Mr. Miles as a process server and law clerk. Mr. Miles considers Applicant a good friend.

Mr. Miles considers Applicant to be of the highest character. He is honest and works hard. He is very intelligent and learns from his mistakes. Mr. Miles feels that Applicant's temperament has changed in the last few years, in that he is not as angry as he once was. Mr. Miles was not examined about his knowledge of Applicant's legal problems.

C. Dafna Levi:

Ms. Dafna Levi is Applicant's wife, and an attorney admitted to practice in California since 1995. She has known Applicant since 1985.

She believes Applicant to be of excellent character. She finds him to be very honest, caring, considerate, compassionate and forthright. He is

very charitable and really believes in spending time with the less fortunate. She feels that Applicant has a true respect for the law and would be an excellent attorney.

Ms. Levi states that Applicant had a hard time adjusting from the Israeli culture, which she described as aggressive, to the culture here. Particularly after their move to San Francisco in 1992, the problems were worse. She felt that after the injunction issued in the Dahlberg matter, it made Applicant understand that others perceived his actions as improper and overly aggressive. She feels that he has calmed down since then.

She described the Pishgar incident as devastating to Applicant. Although Applicant had calmed down a lot, while "we were being dragged through all of this" it was very distressing. She believes that Applicant has learned from his mistakes, now knows the rules, and would be a good attorney.

4. Evidence of Good Works:

As noted above, Applicant has engaged in extensive community service virtually his whole adult life. Particularly since coming to the Bay Area, Applicant has devoted many hours to caring for shut-ins, teaching, tutoring and other good works. This work is entitled to recognition as a component of Applicant's rehabilitation.

Conclusions of Law:

As in every moral character case, the ultimate issue comes down to the simple question of whether Applicant can be trusted: trusted to handle other people's important affairs, and trusted with their monies. Here, Applicant's past misconduct vis a vis his vexatious litigation, related harassment, his assault and criminal conviction, and related litigation, all raise serious issues as to his reliability and ability to handle serious affairs

21

1  in an appropriate and ethical manner. His lack of candor is a major

2  concern. The Court concludes that the showing of rehabilitation which

3  Applicant makes at the present time is simply not sufficient to overcome

4  this evidence of past misconduct.

5  1. Remorse and Recognition of Wrongdoing:

6  Although it has been said that rehabilitation is measured objectively,

7  at least one element is necessarily subjective. That is the element of

8  heartfelt remorse which is the true hallmark of a rehabilitated individual.

9  The Supreme Court has stated: "Rehabilitation is a 'state of mind' and the

10  law looks with favor upon. rewarding with the opportunity to serve, one

11  who has achieved 'reformation and regeneration.' " ( Pacheco v. State Bar

12  (1987) 43 Cal.3d 1041, 1058, citing In re Gaffney (1946) 28 Cal.2d 761.)

13  For a long while Applicant refused to acknowledge that there was

14  anything wrong with his past conduct. He blamed others for his own

15  misconduct (i.e., Ms. Pishgar) and blamed many of his problems on the

16  improper holdings of the courts. He was warned by more than one court

17  that his improper and litigious behavior would reflect poorly on his ability

18  to be admitted to practice, but ignored those warnings. He had no insight

19  whatsoever into the moral shortcomings of his actions.

20  It is unclear whether Applicant presently recognizes that his past

21  actions were morally wrong, in the sense that they showed an extreme

22  disregard for the rights of others and the legal system. He does not reflect

23  upon the results of his actions: the physical and emotional harm to Ms.

24  Pishgar;  the harm to those drawn into emotionally and financially

25  exhausting litigation.  It is in this regard that his lack of candor is most

26  troubling. For example, he attempted to seal the courts' rulings about his

27  misconduct rather than acknowledge wrongdoing. He still argues that his

28

1    misconduct was simply not serious enough to preclude his admission.
2    Although Applicant clearly feels some remorse. it is remorse that his
3    actions have caused his present difficulties in gaining admission to the bar.
4    2. Restitution:

5        The Court appreciates the concrete acknowledgment of wrongdoing ,
6    and attempt to make things right, which restitution represents. (E.g. In re
7    Menna (1995) 11 Cal.4th  975, 990.) However, it also notes that Applicant's
8    payments were the payments of legal debts, not voluntary payments made
9    without compunction of court order.
10   3. Psychological Rehabilitation:

11       Applicant underwent a course in anger management in 1998 as a
12   result of his criminal probation. That course seems to have helped him
13   greatly. He appears to be much better able to control his actions when
14   angry. Hopefully this provides some assurance that an incident such as the
15   Pishgar assault will never happen again.

16       Applicant also appears to have made significant progress in his work
17   with Dr. Sharpe. She showed great insight into his character and his
18   problems, and seems to have had some success sharing these insights with
19   Applicant. She stated that Applicant is progressing, but could not say with
20   any surety what Applicant's reaction to the stresses of law practice might
21   be. Given Applicant's resort to frivolous and harassing litigation in the
22   recent past, this is a serious matter of concern.

23       The length of Applicant's psychological rehabilitation is very short.
24   He began counseling treatment only in 1997, and it was not until late 1998
25   that Dr. Sharpe saw truly significant improvement.  His treatment is
26   ongoing, and it is apparent that his psychotherapy is important in allowing
27   him to continue his recovery. Most mental health experts agree that the
28

only reliable indicator of continued rehabilitation is past conduct: i.e., a sustained period of recovery and rehabilitation. While Applicant has made good progress, the Court is unable to find a sustained period of rehabilitation which provides the requisite assurance that his conduct of the practice of law will reflect only the highest qualities of moral conduct.

Where past misconduct has been serious and has continued over a period of years, as here, rehabilitation also needs to be measured in significant periods of time (See In re Menna (1995) 11 Cal. 4th 975 ( five and one-half years of good conduct insufficient to show rehabilitation from very serious misconduct ); compare Martin B. v. Committee of Bar Examiners (1983) 33 Cal.3d 717 [nine years of exemplary conduct was sufficient]; Pacheco v. State Bar, (1987) 43 Cal.3d 1041 [seven years of rehabilitation adequate.])

4. Character Witnesses:

Although the witnesses whom Applicant presented were favorable to him, they were few in number. Further, not all of them were aware of all of Applicant's past misconduct. The Court has been unable to conclude that Applicant has presented a broad showing of support from the community and the profession which attests to his well known good character. (Compare Tardiff v. State Bar (1980) 27 Cal.3d 395, 403 [testimony of eight character witnesses, five of whom were attorneys, was given great consideration in reinstatement proceeding] with In the Matter of Hagen (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 153, 171 [testimony of three character witnesses, including one judge and one attorney, not given significant weight in mitigation because of inadequate number.].)

5. Good Works:

Applicant certainly deserves great credit for his significant charity

1    work. This has been work freely done, in many areas of the community,
2    and has no doubt benefitted many individuals. Such activity is an
3    indication of good character and is entitled to weight. ( Allen v. State Bar
4    (1962) 58 Cal.2d 912, 914; In re Werner (1954) 42 Cal.2d 187, 190. ) In
5    fact, it is baffling to the Court how someone so committed to good works in
6    the community could at the same time engage in the types of misconduct
7    in which Applicant engaged. The Court can only hope that Applicant will
8    focus on this type of activity, particularly his supervised pro bono legal
9    work, to strengthen his case with the Committee when he reapplies for
10   admission.

11   CONCLUSION:

12       Applicant engaged in serious misconduct for several years. Luckily,
13   he has finally identified the sources of his inappropriate behavior and is
14   taking steps to remedy it. The Court applauds his efforts and strongly
15   commends his course of rehabilitation. The Court is sure that if his
16   rehabilitation continues uninterrupted, and results in no further
17   misconduct, Applicant will soon have a record that will justify his
18   admission to the State Bar of California. However, at the present time
19   Applicant simply does not have a long enough record of successful
20   rehabilitation to ensure that his past misconduct will not recur. Therefore,
21   the Court is unable to certify that he is of good moral character at the
22   present time.

23

24

25   December 3, 1999

26                                   Nancy Roberts Lonsdale -

27                                   Judge, State Bar Court

28

                              25

# CERTIFICATE OF SERVICE
[Rule 62(b), Rules Proc.; Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court.  I am over the age of eighteen and not a party to the within proceeding.  Pursuant to standard court practice, in the City and County of San Francisco, on December 7, 1999, I deposited a true copy of the following document(s)

DECISION

in a sealed envelope for collection and mailing on that date as follows:

[XX] by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at San Francisco, California, addressed as follows:

JEROME FISHKIN  ESQ
369 PINE ST  STE 627
SAN FRANCISCO  CA  94104

[] by certified mail,  , with a return receipt requested, through the United States Postal Service at San Francisco, California, addressed as follows:

[XX] by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

DONALD R STEEDMAN  ESQ
OFFICE OF TRIAL COUNSEL - SF

I hereby certify that the foregoing is true and correct.  Executed in San Francisco, California, on December 7, 1999.

George Hue
Case Administrator
State Bar Court

DOS - 5/98