**EXHIBIT 3**

**CONFIDENTIAL**          **FILED**

MAR 1 8 2004

STATE BAR COURT CLERK'S OFFICE
SAN FRANCISCO

### THE STATE BAR COURT

### HEARING DEPARTMENT - SAN FRANCISCO

In the Matter of            )     Case No. 02-M-12939-PEM
                            )
**SIMON SHARON LEVI,**       )     **DECISION**
                            )
                            )
                            )
Applicant for Admission.     )

## I. INTRODUCTION

This confidential matter comes before the Court on a second request for a hearing based on the Committee of Bar Examiner's ("Committee") refusal to recommend Simon Sharon Levi ("Applicant") for admission to the State Bar to the Supreme Court of California. Applicant is *pro se*. The Committee is represented by Deputy Trial Counsel Maria J. Oropeza and Donald Steedman.

A hearing in the matter was held on February 10, 11, 13 and 18, 2004. The matter was submitted for decision on February 18, 2004.

Applicant filed his second application for determination of moral character on March 20, 2001. On June 13, 2002, the Committee advised Applicant that it declined to recommend his admission to the State Bar to the Supreme Court of California. On June 18, 2002, Applicant requested a hearing on the matter.

This Decision focuses on Petitioner's conduct following this Court's December 7, 1999 Hearing Department Decision and the Review Department Opinion filed April 12, 2001 denying him a determination of good moral character. It is based on the parties' stipulation of facts, the petition and the Committee's response thereto, the Review Department Opinion and the evidence

1    and the testimony introduced at this proceeding.  For purposes of brevity, the Review

2    Department's finding of facts and law  are incorporated by reference, as if set forth fully herein.

3    A copy of *In the Matter of Simon S. Levi*, case no. 99-M-10079, filed April 12, 2001, is affixed

4    hereto as Attachment A.

5        The Court is unable to certify Applicant's good moral character at this time.  Applicant's

6    conduct since the Hearing Department's 1999 Decision  has been imbued with elements of moral

7    turpitude.  Applicant's efforts at rehabilitation are recent, unfinished and insufficient.

8    Accordingly, Applicant's admission to the practice of law in California is denied.

9                    II.  **MORAL CHARACTER DETERMINATION**

10        This Court may recommend the admission of an Applicant who is certified to be of good

11    moral character.  (Business and Professions Code, section 6060(b).)[1]  Good moral character  has

12    traditionally been defined as the absence of conducted imbued with elements of "moral

13    turpitude." (*Hallinan v. Committee of Bar Examiners* (1966) 65 Cal.2d 447, 452; *Hightower v.

14    State Bar* (1983) 34 Cal.3d 150, 157.)  However, in this state, the term "good moral character"

15    encompasses more than just the absence of conduct involving moral turpitude.  It also includes

16    traits of " honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility,

17    respect for and obedience to the laws of the state and the nation and respect for the rights of

18    others and for the judicial process." (Rules Regulating the Admission to Practice of Law, rule X,

19    § 1; *In re Gossage* (2002) 23 Cal.4th 1080, 1095; *In re Menna* (1995) 11 Cal.4th 975, 983.)

20        In a moral character proceeding, the applicant must first establish a prima facie case that

21    he or she possess good moral character; the State Bar may then rebut that showing with evidence

22    of bad moral character.  If it does so, the burden then shifts back to the applicant to demonstrate

23    his or her rehabilitation. (*In re Menna, supra*, 11 Cal.4th at p. 984.)

24        "The amount of evidence of rehabilitation required to justify admission varies according

25    to the seriousness of the misconduct at issue." (*Id.* at p. 987 citing with authority *Kwasnik v.

26    State Bar* (1990) 50 Cal. 3d 1086.)  Ordinarily, all reasonable doubts are resolved in the

27

28            [1] Hereinafter, all further references to Business and Professions Code are identified as "section."

1   Applicant's favor. (*Kwasnik v. State Bar, supra,* 50 Cal.3d at p. 1068) But "[w]here serious or

2   criminal misconduct is involved, positive inferences about the applicant's moral character are

3   more difficult to draw and negative character inferences are stronger and more reasonable." (*In re*

4   *Gossage, supra,* 23 Cal.4th at p.1098.)

5       In a case such as the present one, where the applicant has been previously denied

6   admission, the determination of rehabilitation requires consideration of the offenses from which

7   he or she has allegedly been rehabilitated and not only the conduct subsequent to the hearing in

8   which admission was initially denied. (*Pacheco v. State Bar* (1987) 43 Cal.3d 1041, 1048.)

9       Finally, because an applicant has the burden of proving he is morally fit, the Supreme

10   Court "may properly refuse to admit an applicant to practice law upon proof that would not

11   justify an order of disbarment" in a disciplinary proceeding. (*Seide v. Committee of Bar*

12   *Examiners* (1989) 49 Cal.3d 933, 938; *Hallinan v. Committee of Bar Examiners, supra,* 65

13   Cal.2d 447, 451-452.)

14            **III. APPLICANT'S GENERAL BACKGROUND**

15   **A.**    **Pre-1997 History**

16       Applicant was born in Israel. After graduation from high school he served in the Israeli

17   Army where he was honorably discharged. In 1987, applicant and his wife Dafna Levi,

18   emigrated to the United States. They originally settled in Southern California, where Applicant

19   learned English and earned a bachelor's degree in economics from California State University,

20   Northridge.

21       In 1993, Applicant and his wife moved to San Francisco, where they both attended law

22   school. She was admitted to the practice of law in 1995. Applicant graduated from San

23   Francisco Law School and took and passed the California Bar Examination in 1997.

24   **B.**    **1999 Application for Admission**

25       Applicant first applied for a determination of good moral character in 1997. The

26   Committee denied his application in June 1998. He requested a hearing on the denial with the

27   State Bar Court. After the Hearing Department's denied Applicant's admission, Applicant and

28   the Committee sought plenary review. In upholding the denial of admission, the Review

1  Department made the following conclusions:

2  **1. Facts and Circumstances Surrounding the July 1996 Altercation and Attack[2]**

3      Applicant's attack on Pishgar, Stinnett, and Kiana involved moral turpitude. His pursuit

4  of a cross-complaint was a deliberate continuation of Applicant's abuse of and harm to Pishgar

5  and Stinnett. Furthermore, Applicant's testimony on the most material issue was not only

6  implausible but unbelievable. Applicant deliberately presented false testimony with respect to

7  the altercation and attack. His presentation of false testimony alone rebutted his prima facie

8  showing of good moral character. [Opinion, pages 20, 21 and 26.]

9  **2. Applicant's Lawsuit Against Safeway and Misconduct Towards Safeway's Counsel**

10      Applicant made clear misrepresentations to the district judge in the Safeway lawsuit

11  which were strong evidence of bad moral character and directly reflected upon Applicant's

12  fitness to practice law. Furthermore, Applicant's aggressive conduct, false statements and

13  wrongful harassment of Safeway's counsel clearly involved moral turpitude and alone rebutted

14  Applicant's prima facie showing of good moral character. [Opinion, page 34.]

15  **3. Applicant's Rehabilitation**

16      Applicant sought the help of Dr. Jude Sharp, a clinical psychologist, in January 1997. Dr.

17  Sharp diagnosed Applicant as having a chronic adjustment disorder with anxiety and depression.

18  He has difficulty adjusting to existing situations and stressors such that he suffered from

19  impairment in social functioning and excessive reaction to identifiable stressors. The Review

20  Department agreed with Dr. Sharp's diagnosis and found that the evidence Applicant presented

21  did not establish that he no longer suffers from this mental disorder. [Opinion, page 40.]

22  Implicit in the Review Department's findings and reliance on Dr. Sharp's opinion was the belief

23  that Applicant's diagnosed mental disorder impacted on his behavior to such extent that he did

24  not possess the moral character required for admission to the State Bar.

25

26  ───────────────

27      [2]In February 1998, Applicant was sentenced for a misdemeanor assault conviction based on an incident that occurred in July 1996. Applicant was sentenced to spend one day in county jail, with credit

28  for time served, three years probation, completion of an anger management program and payment of restitution. The conviction was expunged in November 1998.

4

### 4. Review Department's Conclusion

The Review Department expressed concern that Applicant's past misconduct raised serious issues as to his reliability and ability as a lawyer to handle serious affairs in an appropriate and non-violent or abusive manner. Equally troubling was Applicant's lack of candor as well as the ease with which he proffered meritless arguments by citing partial quotes, omitting the parts that were detrimental to his position. The Review Department concluded that seriousness of Applicant's misconduct and its pertinence to his fitness to practice law, as well as his lack of candor, respect for the law, and respect for the rights of others, meant that he must present substantial evidence of rehabilitation to gain admission and that he had failed to do so.

## IV. APPLICANT'S PRIMA FACIE SHOWING OF GOOD MORAL CHARACTER

An applicant's initial burden of establishing a prima facie showing is "relatively" easy. It has been met by testimonials from as few as two witnesses in addition to the testimony of the applicant. (See, e.g., *Hall v. Committee of Bar Examiners* (1979) 25 Cal.3d 730, 734-735.)

The Court finds that Applicant made a prima facie showing of good moral character based upon the testimony of his witnesses and himself. At the hearing, Applicant presented favorable character testimony of six witnesses, including two attorneys and a rabbi, all of whom testified to his excellent moral character and to the fact that they had never seen Applicant act inappropriately. Applicant also testified as to his history of extensive participation in charitable and civil activities.[3] Applicant's most recent charitable activities included working for Stand Against Domestic Violence (STAND), Shalom Bayit (Peace in the Domestic Home) and the Child Abuse Prevention Agency.[4]

## V. THE COMMITTEE'S REBUTTAL OF APPLICANT'S PRIMA FACIE CASE

### A. Applicant's Conduct at Golden Gate University

### 1. Formal Sexual Harassment Complaint

---

[3] The Review Department found that Applicant had a history of participation in charitable activities that was corroborated by various documents.

[4] However, it should be noted that Applicant provided no documentary evidence to corroborate his most recent charitable activities.

1    In August 1999, Applicant enrolled in the LLM program at Golden Gate University

2    (GGU).  In January 2000, he met a fellow student, Sara Raymond, in a homeless advocacy

3    training session at Hastings College of the Law.

4    Shortly thereafter, Sara and Applicant began building a relationship, beginning with an

5    exchange of emails and class outlines, and conversation while commuting to and from school via

6    public transportation.

7    Around May 15, 2000, Applicant unexpectedly left in Sara's mail slot  at school a box of

8    chocolates.  Sara sent him an email thanking Applicant for his thoughtfulness.  On May 17, 2000,

9    Applicant sent Sara an email in which he made it clear that he had a sexual interest in her even

10   though he was married.  (Exhibits 2-7.)

11   By June 2000, Sara became wary of Applicant's attention toward her.  She sent him an

12   email asking that he stop emailing her as he made her feel very uncomfortable.  She warned

13   Applicant that, if she received any more emails from him or was forced into a conversation with

14   him, she would not hesitate to discuss his behavior with Deans Glaze, Keane and Oppenheimer

15   and Professor Satharitkul.  (Exhibit 9.)  At the same time, Applicant sent Sara an email asking

16   her to think of him as deceased and stating that he did not intend to talk to her ever again.

17   (Exhibit 10.)

18   On August 10, 2000, however, Applicant placed the following material in Sara's post

19   office box at GGU:  a two-page letter addressed to "Dearest Sara"; a typewritten note beginning

20   with the words "helo i chinees"; a $200 gift certificate from Coach; and a handwritten note.

21   (Exhibits 10, 10a-c.)

22   Sara became concerned for her physical safety.  In the letter, Applicant expressed a

23   willingness to kill himself if anything happened to her due to his overwhelming love for her.  He

24   detailed his plans to kill himself by driving to the Orinda BART station and placing a bullet at a

25   point of his chest where the sun and moon meet.  The "sun and the moon" statement referred to a

26   tattoo that Raymond told Applicant that she had on her body.  Sara understood both of these

27   references to constitute veiled threats against her.

28   Because she believed she was in danger, Sara met with GGU's Interim Associate Dean,

1   Sue Schechter, to discuss Applicant's contacts with her. Dean Schechter credibly testified that

2   Sara was in tears and was visibly scared and frightened when Sara came to her office. Dean

3   Schechter contacted GGU's security office and the San Francisco Police Department (SFPD).

4        On August 11, 2000, Sara filed an incident report with the SFPD. While Applicant

5   admits that Sara was concerned for her safety, he claims that he has no idea of why she might

6   have such a concern. He maintains that the letter was written as an apology and to make amends

7   for his conduct. On August 16, 2000, Sara filed a formal complaint against Applicant with GGU

8   officials alleging a violation of the school's code of conduct, specifically a violation of the sexual

9   harassment policy.

10       During August, it came to GGU's attention that Applicant and Sara were both enrolled in

11  the Jessup Moot Court Competition in International law. When Sara entered the classroom  and

12  saw him, she ran out of the room, dropping all her books. She was visibly shaken.

13       GGU asked Applicant to withdraw from the class. Initially, Applicant agreed but, later,

14  changed his mind. GGU removed him from the class administratively.

15       During August and September, Dean Schechter conducted an investigation into Sara's

16  formal complaint. She determined that Applicant had violated GGU's sexual harassment policy

17  and recommended that the complaint be referred to a hearing panel for disciplinary action.

18  **2. Standards of Student Conduct–Revoking of Email Privileges**

19       During Dean Schechter's investigation of Sara's complaint, Applicant began to post what

20  many students perceived as offensive and abusive emails on the GGU bulletin board. On

21  September 1, 2000, he posted an article entitled  "How to be a Good Wife," with a tag line "read

22  and learn." (Exhibit 13.) Several students replied to this email in a non-offensive manner.

23  (Exhibits 13a-c.) Inexplicably, Applicant sent a mass email to the entire GGU student body

24  responding  in a vituperative manner to the students who replied to his September 1 email.

25  (Exhibit 14.)

26

27

28

1    On September 5, 2000, Peter Keane,[5] Dean of GGU, filed an informal complaint against

2    Applicant with respect to the content of his mass emails to students and faculty. Dean Keane

3    alleged that the content of Applicant's emails was offensive and abusive and, therefore, in

4    violation of the Student Code of Conduct. (Exhibit 16.) On that same date, Dean Keane also

5    suspended Applicant's email privileges, barring him from posting anything further on the GGU

6    system. He informed Applicant that, if the email postings continued, Applicant would face

7    disciplinary action. On September 5, 2000, Applicant acknowledged receipt of Dean Keane's

8    email and agreed that he would not post anything on GGU online until further notice from Dean

9    Keane. (Exhibit 17.)

10    On September 10, 2000, Applicant sent an email to Dean Keane, explaining and

11    apologizing for his behavior. He requested that the dean reconsider the filing of the informal

12    complaint. Dean Schechter conducted an investigation of Dean Keane's informal complaint.

13    Dean Schechter made findings that Applicant had violated the standards of student conduct by

14    putting offensive and potentially harassing emails and/or responses to emails on line and by

15    misrepresenting how long he had a GGU account. She made a disciplinary recommendation that

16    Applicant receive a warning and a loss of privileges.

17    On September 26, 2000, Applicant received an email that he should attend a meeting with

18    Deans Keane and Schechter on September 28 to discuss the informal complaint with respect to

19    emails. Applicant did not think the meeting was to discuss the formal sexual harassment

20    complaint because that matter was being scheduled to be heard before a hearing panel.

21    On September 28, 2000, Applicant met with Deans Keane and Schechter. He was given

22    a choice of voluntarily withdrawing from GGU or being expelled. Applicant testified that he was

23    shocked at being given such an ultimatum as he had expected that he was there to only discuss

24    the informal complaint.

25    After a brief, heated discussion with Dean Keane, Applicant left and immediately

26

27    _____

[5] The Court disclosed to the parties that Dean Keane was the undersigned judge's employer for a

28    time. Applicant was aware of this relationship and waived any potential conflict. There has been no communication between the Court and Dean Keane regarding the instant matter.

1  published and disseminated flyers entitled "Peter Keane Lost It" and "Did Peter Keane lose his

2  mind." Applicant handed copies of these flyers to passers-by in front of GGU. (Exhibits 19 and

3  20.) The Committee contends that the flyers included slanderous statements about Dean Keane,

4  specifically:

5        (a) "...you forgot to take your medication that day...";

6        (b) "...the Viagra is not as effective as you had hoped; and

7        (c) "...your wife ran away to Mexico with the poooll-man (*sic*)".

8        Applicant admits that he knew nothing about Dean Keane's wife and that he did not take

9  the matters that he stated in his flyers seriously. Applicant testified that, at the time he published

10 and disseminated the leaflets, he felt he was traumatized by the ultimatum given to him and felt

11 alienated. Applicant made these assertions about Dean Keane's alleged use of psychotropic and

12 erectile dysfunction medication and the status of his marriage without a basis for believing these

13 statements were true.

14 **3. Conduct after Withdrawal from GGU**

15       Sometime after the September 28 meeting and October 2, 2000, Applicant, with the aid of

16 his wife, Dafni Levi, negotiated a settlement where he would withdraw from GGU to avoid a

17 formal disciplinary hearing. (Exhibits O and Q.)

18       On October 6, 2000, after withdrawing from GGU, Applicant emailed Professor Hartnell

19 and as many as 200 hundred students a missive purporting to explain why he was not in the

20 Jessup Moot Court Competition class. He complained that Sara's formal complaint contained

21 many lies and misrepresentations of fact and that any of her fears for her physical safety were

22 fanciful as to him. (Exhibit 21.) Moreover, he threatened to be outside the graduation ceremony

23 passing out flyers "telling everyone what a liar Ms. Raymond is." Applicant explained that his

24 behavior was justified because Sara did not spare his honor and, therefore, he had no obligation

25 to spare hers.

26       On October 9, 2000, Dean Keane sent an email to GGU students suggesting that they not

27 encourage Applicant's conduct by responding to his emails. On October 11, 2000, Applicant

28 responded to Dean Keane's email by sending a mass email to as many as 200 students and

1    included several emails that he sent other students with respect to the sexual harassment.

2    (Exhibit 23.)

3         On October 13, 2000, Applicant sent yet another email to as many as 200 students in

4    which, among other things, he called Dean Keane a skunk; held Dean Keane responsible for what

5    Applicant believed was the low morale of the student body; and accused him of mishandling

6    Sara's complaint. (Exhibit 24.)

7         On October 16, 2000, after GGU blocked two of Applicant's email accounts to prevent

8    him from sending mass emails, Applicants created another email account. He sent another mass

9    email in which, among other things, he ranked several female students , including Sara,

10   according to their physical attributes; gave his view on gay adoptions; expressed the belief that

11   people who have AIDS or are HIV positive should be immediately captured and placed in

12   quarantine in an army installation on the island of Guam; and that Dean Keane qualified to be a

13   member of the "Order of the Skunk". (Exhibit 26.)

14        On October 20, 2000, Applicant sent another  mass email in which he promised to

15   substantially reduce his rhetoric against the "gay agenda" and Dean Keane, yet he attached an

16   article entitled "The Truth About Homosexuality."

17        On October 27, 2000, Lani Bader, GGU's General Counsel advised Applicant via email

18   that his emails were offensive and abusive.  She reminded him that the school had a private email

19   system and that he had already been advised not to use it.  (Exhibit 30.) At the hearing  Applicant

20   testified  that the reason he disseminated flyers and sent emails is that he felt forgotten,

21   traumatized and alienated, in addition to being despondent.  Applicant was angry that he was

22   never given the hearing that he felt entitled to under the student handbook rules.  Respondent

23   also felt that, since he withdrew from GGU, he was no longer subject to its jurisdiction and did

24   not have to follow Dean Keane's directives regarding using GGU's email system.  (Exhibit 15.)

25   He further averred that the emails and flyers were a way to address and share his pain and

26   grievances.

27        The Court believes that Applicant's behavior demonstrates that he still suffering from an

28   adjustment disorder.  It does not appear that he has boundaries as to his behavior or a notion of

1  what an apology is or how another person will perceive his behavior. He misinterprets events
2  and behavior. For example, he sent offensive email rating certain women's physical attributes,
3  including Sara's, because he thought it was funny. He is aggressive and angry. Disseminating
4  flyers and email because he claimed to have been traumatized, alienated or forgotten are
5  consistent with an adjustment disorder.

6      The Court notes that this conduct occurred during 2000 while the initial adverse moral
7  character determination was pending adjudication in the State Bar Court.

8  **B.**     **Applicant's Failure to Disclose GGU Incidents on theApplication for Admission**

9      Question 13.1 of the State Bar's application for admission states: "Have you ever been
10  dropped, suspended, expelled or otherwise disciplined by any school for any reason other than
11  academic performance?" Applicant marked the box with the word "NO".

12      The Committee contends that he should have answered "YES" because Applicant had
13  been disciplined by GGU in September and December 2000. Applicant avers that he was never
14  disciplined by GGU and thus had every right to answer the question " NO".

15      While at GGU Applicant had two complaints filed against him. One was an informal
16  complaint where his email privileges were revoked. (Exhibit 15.) The other complaint was the
17  formal complaint of sexual harassment. (Exhibit 35.) According to the student handbook and to
18  Dean Schechter, an informal complaint is totally confidential and is not reported to the State Bar.

19      On September 28, 2000, Applicant met with Deans Keane and Schechter ostensibly to
20  discuss the informal complaint. Instead, Applicant was given the ultimatum of withdrawing or
21  proceeding with an expulsion hearing. At that time, the hearing on the formal complaint had not
22  yet been scheduled, hence no disciplinary action had been taken place. There had only been a
23  disciplinary recommendation. Dean Schechter admitted that Applicant was never disciplined
24  because he withdrew from GGU before there was a hearing on the recommendation.

25      It is clear that Applicant exercised his option to withdraw to avoid disclosure to the State
26  Bar that he was disciplined. It is also clear that this was a major concern of his during the time
27  his spouse was negotiating the terms of withdrawal. (Exhibit Q.)

28      Considering the above-named factors, Applicant was truthful, technically. He did not

1   have an obligation to disclose the incidents at GGU because question 13.1 does not address

2   withdrawal. Applicant withdrew from GGU to avoid discipline and the subsequent disclosure to

3   the State Bar. However, when the totality of Applicant's conduct is considered, it appears that he

4   was not as open and straightforward as he could have been under the circumstances.

5   **C.    Lawsuit Alleging A Violation of the English-Only Initiative**

6           On May 23, 2001, Applicant filed suit against State of California, specifically Gray

7   Davis, the Department of Motor Vehicles (DMV), the State Bar of California, the State Bar

8   Court, the California Supreme Court and Justices, George, Baxter, Brown, Chin, Kennard, Mosk,

9   and Werdegar, the Employment Development Department (EDD) and the Attorney General

10  alleging a violation of the English-Only Initiative for communicating with citizens in languages

11  other than English. In May 2002, the lawsuit was dismissed as to the State Bar based on the

12  granting of a summary judgment motion.[6] Applicant dismissed some parties. As to the

13  remaining parties (DMV and EDD), a summary judgment motion was granted with leave to

14  amend but Applicant did not amend his pleadings.

15          In view of the Review Department's decision on the Safeway litigation, the Court does

16  not believe that filing the English-Only lawsuit is an indication of bad moral character. With

17  regard to the Safeway litigation, the Review Department stated that pursuing the case was not

18  evidence of bad moral character, but rather, many of Applicant's actions surrounding that lawsuit

19  involved bad moral character. (Opinion, page 18.) In the instant case, there was no evidence of

20  Applicant's conduct about filing the English-Only lawsuit. The Court finds that the English-

21  Only lawsuit does not reflect on Applicant's moral character.

22  **VI. APPLICANT HAS FAILED TO PROVE HIS REHABILITATION**

23          This Court believes that the character witnesses Applicant presented were enough to

24  establish his prima facie case but not enough to establish his rehabilitation. None can testify

25  about his daily living habits. Keith Burdt sees Applicant in religious education and Hebrew

26  classes once a week for six to eight hours. He was not thoroughly familiar with the charges of

27  _____

28          [6]On January 23, 2003, the Court of Appeal upheld the superior court's ruling dismissing the State
    Bar from this litigation.

1   misconduct against Applicant. Applicant never told him about the Raymond matter. Rabbi

2   Barros has only known Applicant for three years and had nothing by which to gauge his behavior.

3   Daniel Sevilla saw the issues regarding Applicant's emails as splitting hairs and believed there

4   was nothing wrong with Applicant's behavior. Connie Stevens sees Applicant once a year, at

5   most. She was his civil procedure professor at San Francisco Law School. James Myles

6   believed that Applicant just got involved in the wrong side of academic politics and that the

7   Review Department denied Applicant's admission because he had been a member of the Israeli

8   Army.

9        Applicant's testimony was insufficient to establish his rehabilitation. His rehabilitation

10   evidence was all self-reported. In the first moral character proceeding, Applicant was found to

11   suffer from an adjustment disorder that impacted his behavior to such an extent that he did

12   not possess the moral character required of admission to the State Bar. He presented no reliable,

13   independent, credible evidence that the condition no longer exists. He testified that he went to

14   Dr. Jude Sharp for two years, completed her program and stopped seeing her because there was

15   nothing to talk about. There is no independent, reliable, credible evidence that he completed the

16   program. Dr. Sharp's last report indicates that he has become more mellow; however, within

17   months, he was charged with sexual harassment and he repeatedly and inappropriately sent

18   emails to the student body of GGU. He was verbally abusive. He escalated and misinterpreted

19   encounters.[7]

20        Moreover, Applicant presented evidence that he is less cranky and less contentious

21   because he dealt with his sleep apnea condition.[8] Without more, there is insufficient evidence to

22   demonstrate a nexus between sleep apnea, the adjustment disorder and his misconduct.

23   ## VII. CONCLUSION

24        Cases authorizing admission on the basis of rehabilitation commonly involve a

25

26       [7]The Court notes that Applicant only submitted Dr. Sharp's report July 17, 2000 letter in support

27   of the present application. OCTC represents that Applicant refused to execute a release authorizing the
Committee to obtain information from Dr. Sharp.

28       [8]The documentary evidence regarding his sleep apnea was inadmissible hearsay.

1  substantial period of exemplary conduct following the applicant's misdeeds. (*In re Gossage*

2  (2000) 23 Cal.4th 1080, 1096.) "Of course, the more serious the misconduct and the bad

3  character evidence, the stronger the applicant's showing of rehabilitation must be." (*Id.*)

4      There is insufficient independent, reliable, credible evidence of rehabilitation from the

5  serious misconduct that led to the initial and present denials of certification to practice law,

6  particularly as to Applicant's psychological and physical conditions, his community service and

7  his reflection on his conduct and remorse for it. The misconduct in the present case took place

8  during the pendency of the initial moral character proceeding in the State Bar Court. The present

9  misconduct, like the prior, shows disrespect toward the rights of others and toward the law.

10  (Opinion, page 41.) Respect for the law and for the rights of others are among the fundamental

11  qualities required of those aspiring to practice law.

12      Further, cases authorizing admission on the basis of rehabilitation commonly involve a

13  substantial period of exemplary conduct following the applicant's misdeeds. (*In re Gossage*,

14  *supra*, 23 Cal. 4th at p. 1096; see also *Kwasnik v. State Bar*, *supra*, 50 Cal.3d at pp. 1071-1072

15  [emphasizing seven or eight-year period that elapsed since applicant wrongfully evaded payment

16  of a civil judgment]; *Martin B. v. Committee of Bar Examiners* (1983) 33 Cal.3d 717, 726

17  [emphasizing nine-year unblemished record after applicant was accused of rape as a Marine];

18  *Hall v. Committee of Bar Examiners* (1979) 25 Cal.3d 730, 742 [emphasizing six-year period in

19  which no complaints were lodged against applicant's employment business after his business

20  license was temporarily suspended by an administrative agency].)  The Review Department

21  noted that Applicant must present substantial evidence of rehabilitation including a significant

22  period of exemplary conduct. (Opinion, pp. 41-42.) This is especially so when this Applicant

23  has been subject to the supervision of the courts or the State Bar almost continuously since

24  February 1998 and he nonetheless continued to misbehave.[9] There has not been a meaningful

25  period of time elapsed since his initial denial and the subsequent, recent misconduct to

26

27      [9]Little weight is given to exemplary conduct while an applicant is under the supervision of the

28  parole authorities or after he or she has applied for admission, since good conduct is expected from such
    an individual. (Opinion, p. 42, citing *In re Gossage*, *supra*, 23 Cal.4th at p. 1099.)

1    demonstrate exemplary and unsupervised conduct for a significant amount of time.

2          Therefore, Applicant has failed to establish that he currently possesses the requisite good

3    moral character for admission to the practice of law in the State of California.

4

5

6

7    Dated: March 18, 2004

                                            PAT McELROY
8                                                Judge of the State Bar Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE
## [Rule 62(b), Rules Proc.; Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of San Francisco, on March 18, 2004, I deposited a true copy of the following document(s):

### DECISION

in a sealed envelope for collection and mailing on that date as follows:

[X]     by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at San Francisco, California, addressed as follows:

> **SIMON S LEVI**
> **25-A CRESENT DR #351**
> **PLEASANT HILL    CA 94523**

[X]     by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

> **DONALD STEEDMAN, Enforcement, San Francisco**
> **MARIA OROPEZA, Enforcement, San Francisco**

I hereby certify that the foregoing is true and correct. Executed in San Francisco, California, on **March 18, 2004**.

George Hue
Case Administrator
State Bar Court

## *AMENDED* CERTIFICATE OF SERVICE
### [Rule 62(b), Rules Proc.; Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of San Francisco, on March 22, 2004, I deposited a true copy of the following document(s):

### DECISION

in a sealed envelope for collection and mailing on that date as follows:

[X]    by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at San Francisco, California, addressed as follows:

> **SIMON S. LEVI**
> **25-A CRESENT DR #351**
> **PLEASANT HILL, CA 94523**

[X]    by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

> **DONALD R. STEEDMAN, Enforcement, San Francisco**

I hereby certify that the foregoing is true and correct. Executed in San Francisco, California, on **March 22, 2004**.

George Hue
Case Administrator
State Bar Court

## *AMENDED* CERTIFICATE OF SERVICE
### [Rule 62(b), Rules Proc.; Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of San Francisco, on March 26, 2004, I deposited a true copy of the following document(s):

### DECISION

in a sealed envelope for collection and mailing on that date as follows:

[X]    by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at San Francisco, California, addressed as follows:

> **SIMON S. LEVI**
> **25-A CRESENT DR  #351**
> **PLEASANT HILLS     CA 94523**

[X]    by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

> **DONALD R. STEEDMAN, Enforcement, San Francisco**

I hereby certify that the foregoing is true and correct. Executed in San Francisco, California, on **March 26, 2004**.

George Hue
Case Administrator
State Bar Court

Confidential Matter – Not To Be Published

F I L E D

APR 1 2 2001

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

# REVIEW DEPARTMENT OF THE STATE BAR COURT

In the Matter of               )      Case No. 99-M-10079
                             )

Simon S. Levi,               )      OPINION ON REVIEW
                             )

An Applicant for Admission.     )
————————————————————)

      Both applicant Simon S. Levi and the State Bar's Committee of Bar Examiners (the committee) seek plenary review[1] of a hearing judge's decision finding that applicant failed to establish that he currently possesses the requisite good moral character for admission to the practice of law in this state. In his 66-page opening brief, applicant attacks almost all of the hearing judge's factual findings and legal conclusions that are adverse to him.

      On the other hand, the committee argues that the hearing judge's findings of fact that are adverse to applicant are supported by the record and that her determination that applicant failed to establish that he is of good moral character is correct. However, the committee also argues that the hearing judge erred in not making six additional findings of fact that are adverse to applicant. The committee requests that we independently make those six

---

[1] See rule 301 of the Rules of Procedure of the State Bar.

additional findings on review. Finally, the committee complains of the hearing judge's statement in her decision to the effect that, if applicant's rehabilitation continues, he "will soon have a record that will justify his admission to the State Bar of California." According to the committee, the hearing judge's statement is an improper and gratuitous prediction and requests that we disapprove of it on review.[2]

After independently reviewing the record (Cal. Rules of Court, rule 951.5 (adopted Feb. 28, 2000); Rules Proc. of State Bar, rule 305(a);[3] *In re Morse* (1995) 11 Cal.4th 184, 207), we, like the hearing judge, conclude that applicant failed to establish that he currently possesses the requisite good moral character for admission. However, we reject her "prediction" to the effect that applicant might soon have a record that would justify his admission as being unsupported by the evidence.[4]

---

[2] Any of the parties' numerous contentions that are not expressly addressed in this opinion have been considered and rejected.

[3] All further references to rules are to the Rules of Procedure of the State Bar unless otherwise indicated.

[4] Applicant's August 2, 2000 motion to augment the record on review is denied in part and granted in part. The transcript of the January 1997 preliminary hearing and the committee's June 1998 letter to applicant and applicant's response to that letter all existed at the time of the trial in this matter (the trial was held in September and October of 1999). Applicant has failed to establish good cause as to why this evidence was not produced at trial. Accordingly, the motion is denied as to those documents. The April 2000, May 2000, and July 2000 letters contain evidence that is relevant to applicant's rehabilitation that occurred after the trial in this matter. The motion is, therefore, granted as to those documents. However, we are unable to give much weight to this additional evidence. The April 2000 and May 2000 letters are not authenticated (i.e., they are not verified), contain only conclusory statements, and add little, if any, to the evidence already in the record showing applicant's substantial civic and charitable involvement. The medical opinions expressed in the July 2000 letter are based largely on the psychologist's conversations and interviews with applicant and are, therefore, suspect. (*In re Lamb* (1989) 49 Cal.3d 239, 247-248, and cases there cited.) This is because "[s]uch evidence is virtually impossible to evaluate in the absence of cross-examination." (*In re Possino* (1984) 37 Cal.3d 163, 171.)

# I. Moral Character Determinations

Attorneys must possess good moral character. (Bus. & Prof. Code, §§ 6060, subd. (b), 6062, subds. (a) & (b); Rules Regulating Admission to Practice Law, rule X, § 1; *In re Gossage* (2000) 23 Cal.4th 1080, 1095.) "'Good moral character' has traditionally been defined as the absence of conduct imbued with elements of 'moral turpitude.' [Citations.]" (*In re Menna* (1995) 11 Cal.4th 975, 983.) However, in this state, the term "good moral character" encompasses more that just the absence of conduct involving moral turpitude. (*Ibid.*) It also includes traits of "honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, respect for and obedience to the laws of the state and the nation and respect for the rights of others and for the judicial process." (Rules Regulating Admission to Practice Law, rule X, § 1; *In re Gossage, supra,* 23 Cal.4th at p. 1095; *In re Menna, supra,* 11 Cal.4th at p. 983.)

The procedures in moral character hearings in the State Bar Court are well established. First, the applicant must furnish sufficient evidence to make a prima facie showing of good moral character. (*Lubetzky v. State Bar* (1991) 54 Cal.3d 308, 312.) If the applicant makes such a prima facie showing of good moral character, the committee may then seek to rebut it with clear and convincing evidence of the applicant's bad moral character. (*Ibid.; In the Matter of Applicant A* (Review Dept. 1995) 3 Cal. State Bar Ct. Rptr. 318, 326-327.) If the committee rebuts the applicant's prima facie showing, the applicant must prove rehabilitation from the acts evidencing bad moral character to prove the requisite good moral character. (*In re Menna, supra,* 11 Cal.4th at p. 984.)

The applicant's burden to establish rehabilitation varies according to the seriousness of the misconduct and bad character evidence that was found to rebut her or his prima facie showing. (*In re Gossage, supra,* 23 Cal.4th at pp. 1096, 1096-1097, fn. 21; *In re Menna, supra,* 11 Cal.4th at p. 987, citing *Kwasnik v. State Bar* (1990) 50 Cal.3d 1061, 1086 (dis.

opn. of Lucas, C.J.).) In other words, "the more serious the misconduct and the bad character evidence, the stronger the applicant's showing of rehabilitation must be. [Citations.]" (*In re Gossage, supra*, 23 Cal.4th at p. 1096.)

Ordinarily, all reasonable doubts are resolved in the applicant's favor. (*Kwasnik v. State Bar, supra*, 50 Cal.3d at p. 1068.) But "[w]here serious <u>or</u> criminal misconduct is involved, positive inferences about the applicant's moral character are more difficult to draw, and negative character inferences are stronger and more reasonable." (*In re Gossage, supra*, 23 Cal.4th at p. 1098 , emphasis added.)

Finally, because an applicant has the burden of proving he is morally fit, the Supreme Court "may properly refuse to admit an applicant to practice law upon proof that would not justify an order of disbarment" in a disciplinary proceeding. (*Seide v. Committee of Bar Examiners* (1989) 49 Cal.3d 933, 938; *Hallinan v. Committee of Bar Examiners* (1966) 65 Cal.2d 447, 451-452.)

## II. Applicant's Prima Facie Showing

An applicant's initial burden of establishing a prima facie showing is "relatively" easy. It has been met by testimonials from as few as two witnesses in addition to the testimony of the applicant. (See, e.g., *Hall v. Committee of Bar Examiners* (1979) 25 Cal.3d 730, 734-735.) During his prima facie case, applicant first presented the testimony of Cassandra Neal (Neal), a law student and fellow law school classmate of applicant until applicant graduated in 1997. Neal testified that applicant possesses good moral character.

After Neal's testimony, applicant testified in his own behalf. He testified that he possesses good character and that he has a history of extensive participation in charitable and civic activities. Applicant's testimony of his charitable activities was corroborated by various documents that the hearing judge admitted into evidence over hearsay objections from the committee.

The hearing judge concluded that applicant made a prima facie showing of good moral character, and the committee does not challenge that conclusion on review. Nor does the committee challenge the hearing judge's factual findings with respect to applicant's prima facie case. Applicant, on the other hand, contends that the hearing judge erred in not making additional positive factual findings regarding his prima facie showing of good moral character. We agree in part with applicant's contention. Accordingly, after reviewing the record de novo, we adopt the hearing judge's factual findings with respect to applicant's prima facie showing of good moral character, but modify them, as set forth below, to include a number of additional positive findings regarding applicant's moral character.[5]  In addition, we adopt the hearing judge's conclusion that applicant made a prima facie showing of good moral character.

Applicant was born in Israel. In 1987, applicant and his wife, Dafna Levi, immigrated to the United States. They originally settled in Southern California, where applicant learned English and earned a bachelor's degree in economics from California State University Northridge.

In 1993, applicant and his wife moved to San Francisco, where they both attended law school. She was admitted to the practice of law in 1995. Applicant graduated from San Francisco Law School and took and passed the California Bar Examination in 1997.

---

[5]However, we decline to make all of the additional findings that applicant seeks. For example, we decline to find that applicant's action in turning over to the police a woman's purse, which contained a substantial sum of money, is "crucial" evidence of and extremely relevant to his showing good moral character. Without question, we support applicant's action and acknowledge that it does favorably reflect upon his moral character. But we cannot conclude that it is crucial or even strong evidence of good moral character or rehabilitation. Such actions are expected of most members of society, particularly those seeking to become a member of a profession. (See Seide v. Committee of Bar Examiners, supra, 49 Cal.3d at pp. 937, 939, 941; In the Matter of Ike (Review Dept. 1996) 3 Cal. S' Bar Ct. Rptr. 483, 490.)

The evidence establishing applicant's prima facie showing includes evidence that applicant was involved with a number of charitable and community activities in Israel for an extended period of time and that he successfully completed three years of mandatory service in the Israel Defense Force. The evidence further establishes that applicant continued his charitable and community activities while he was in law school. While in law school, he tutored other students without receiving monetary compensation. Applicant did, however, occasionally receive non-monetary compensation from the students in that they would help applicant with various projects or perform clerical-type tasks for him. Applicant was a leader in his law fraternity and established a tutorial program, a library of study aids, and a food drive for the poor in San Francisco.

In approximately 1996, applicant became a "Meals on Wheels" volunteer. Since becoming a volunteer in that program, applicant has gone shopping each week for an elderly woman and occasionally has done light maintenance in her apartment. In approximately 1997, applicant became a "Books for the Homebound" volunteer. Since becoming a volunteer in that program, applicant has gone to the library every two weeks and checked out books-on-tape for an elderly blind man. Applicant has also occasionally taken this elderly gentleman out to lunch and done some minor shopping for him.

Between 1995 and 1997, applicant volunteered once a week or once every other week at "Food Runners," which is a program that collects excess food from hotels and restaurants and takes it to various homeless shelters. From his youth and up until approximately 1996, applicant routinely donated blood. Because of a medical condition, applicant stopped donating blood in 1996 in accordance with his doctor's instructions.

During the end of 1997, applicant became a volunteer at the Homeless Advocacy Project of the Bar Association of San Francisco. Since becoming a volunteer in that program, applicant has provided legal advice under the supervision of licensed attorneys to

homeless individuals almost every other week. In December 1998, applicant was one of ninety individuals who were recognized by the Bar Association of San Francisco as outstanding volunteers in public service.

Moreover, applicant was a "Project Read" volunteer for approximately one year. In that program applicant spent two or three hours each Saturday for a year teaching an individual how to read.

In sum, we adopt the hearing judge's findings of facts with respect to applicant's prima facie showing as modified above as well as her conclusion of law that applicant made a prima facie showing of good moral character.

### III. Committee's Rebuttal

The hearing judge determined that the committee rebutted applicant's prima facie showing of good character by establishing: (1) that applicant has a prior conviction for attacking a woman; (2) that, when the woman whom applicant attacked filed a civil suit against him, he filed a meritless cross-complaint against her, terrified her by attempting to videotape her deposition, and threatened to make a citizen's arrest of her; (3) that applicant's testimony about the facts and circumstances surrounding his attack of the woman lacked credibility and candor; (4) that applicant engaged in frivolous litigation against a Safeway grocery store for the purpose of harassment;[6] (5) that applicant engaged in a continuing pattern of harassment against Safeway's attorneys and the attorneys' employees; (6) that applicant demonstrated a lack of candor by attempting to seal various court orders in an apparent attempt to keep them from being introduced into evidence in the present proceeding;

---

[6]At trial, the committee also asserted that applicant filed and pursued a frivolous lawsuit against a Target store. The hearing judge rejected the committee's contention because applicant dismissed the lawsuit once a demurrer was filed. On review, the committee does not challenge the hearing judge's conclusion. After independently reviewing the record, we adopt it.

and (7) that applicant lacked candor in his dealing with the committee during its investigation into his moral character.

After independently reviewing the record, we modify the hearing judge's findings with respect to the committee's rebuttal case by rejecting a number of her findings and by independently making additional findings of our own, all as set forth below. We conclude, as did the hearing judge, that the committee rebutted applicant's prima facie showing of good moral character.

## A.   Applicant's Attack on Susan Pishgar and Others

On July 19, 1996, applicant was involved in an altercation with Susan Pishgar (Pishgar) and Roger "Puck" Stinnett (Stinnett). As a result of the altercation, a six-count criminal complaint was filed against applicant in July 1996. That complaint was later replaced with a seven-count information. Two counts were dismissed from the information, and in the five remaining counts, applicant was charged with (1) felony assault with a deadly weapon (i.e., pepper spray) on Pishgar, (2) felony use of tear gas on Pishgar, (3) felony assault with a deadly weapon (i.e., pepper spray) on Stinnett, (4) felony use of tear gas on Stinnett, and (5) misdemeanor causing harm to Pishgar's five-year-old daughter, Kiana Pishgar (Kiana), who was present at the scene of the altercation.

In October 1996, Pishgar (who was applicant's primary victim) filed a civil suit against applicant and others seeking damages for the injuries she and Kiana sustained from applicant's attack (the Pishgar lawsuit). Then, in June 1997, applicant filed a cross-complaint against Pishgar, Kiana, Stinnett, Pishgar's employer, and others. In his cross-complaint, applicant alleged, inter alia, that he did not attack Pishgar or Stinnett, but that it was Pishgar and Stinnett who attacked him, and that Pishgar's employer should have known of Pishgar's propensity for violence. Thereafter, in December 1997, all of the criminal charges and the Pishgar lawsuit were resolved under a coordinated settlement agreement.

8

Under the terms of the settlement agreement: (1) count two of the information was amended to charge applicant with misdemeanor battery of Pishgar; (2) applicant pleaded nolo contendere to and was convicted of the misdemeanor charge of battery on Pishgar; (3) the remaining four counts in the information were dismissed; (4) applicant dismissed the cross-complaint he filed in the Pishgar lawsuit; and (5) a stipulated judgment was entered against applicant in the Pishgar lawsuit. Under the terms of the stipulated judgment, applicant was required to pay $13,000 in damages to Pishgar and $2,000 in damages to Kiana.

In the criminal case, applicant was, inter alia, sentenced to one day in the county jail, placed on three years' probation, ordered to complete an anger management program, and ordered not to directly or indirectly contact or communicate with Pishgar and Stinnett. In accordance with the stipulated judgment in the Pishgar case, applicant paid the total damages of $15,000 to Pishgar and Kiana. Even before he finished paying the $15,000 to Pishgar and Kiana, applicant's probation was terminated early. Furthermore, applicant made a motion under Penal Code section 1203.4, to withdraw his plea of nolo contendere and to have the criminal information dismissed. The criminal court granted that motion and, in November 1998, filed an order permitting applicant to withdraw his nolo contendere plea to the misdemeanor battery charge, vacating the verdict based on that plea, and dismissed the information. Notwithstanding the criminal court's dismissal of the information against applicant, he was required to disclose, and did disclose, the criminal case to the committee on his application for moral character determination. (Penal Code, § 1203.4, subd. (a).)

Citing Business and Professions Code section 6101, subdivision (a), the hearing judge concluded that applicant's nolo contendere plea conclusively established that he committed each of the elements of a battery on Pishgar during the July 1996 altercation and attack. Moreover, the hearing judge found that applicant's testimony regarding the altercation and his attack of Pishgar lacked credibility and candor. In addition, she found that "[a]pplicant's

version of events is implausible, inconsistent, and is undercut by his admission of criminal wrong-doing." Finally, the hearing judge found Pishgar's and Stinnett's testimony regarding the altercation and attack to be credible.

First, applicant contends that the hearing judge erred in holding that applicant's nolo contendere plea conclusively established that he committed each of the elements of a battery on Pishgar. Second, applicant contends that the hearing judge erred in considering and relying on applicant's nolo contendere plea and misdemeanor conviction to make credibility determinations, factual findings, and legal conclusions adverse to applicant. Third, applicant contends that the hearing judge erred in finding that applicant's testimony lacked credibility and candor. Fourth, applicant contends that the hearing judge erred in finding that Pishgar's and Stinnett's testimony is credible.

We need not decide whether the hearing judge correctly relied on applicant's nolo contendere plea as the parties fully litigated the facts and circumstances of the matter. Accordingly, we can and do independently review the record and make our own findings of facts and conclusions of law with respect to the July 1996 altercation without considering or using applicant's nolo contendere plea or conviction. Our independent review renders the challenges that applicant raises with respect to the hearing judge's reliance on applicant's plea and conviction moot.

As discussed below, we reject applicant's third and fourth contentions challenging the hearing judge's credibility and candor determinations.

1.    Facts and Circumstances Surrounding the July 1996 Altercation and Attack

In July 1996 applicant worked as a civil process server. On the morning of July 19, 1996, applicant was to serve copies of a summons and complaint in an unlawful detainer action on a Greg Levine who lived in an apartment at 685 Fell Street in San Francisco.

10

Instead of going to the apartment building at 685 Fell Street, applicant went to the building at 600 Fell Street. Applicant claims that he went to 600 Fell Street by mistake because he could not find or see the street number. We reject applicant's claim because, as Pishgar credibly testified, there is a large awning over the building's doorway with the street number "600" clearly marked on each of the awning's three sides. Moreover, 600 Fell Street is not even on the same side of the street as 685 Fell Street.

While applicant was standing outside the security gate in front of 600 Fell Street on the morning of July 19, 1996, Stinnett, a hair dresser who lives in an apartment in the building at 600 Fell Street, walked up to the security gate and opened it with his key. When Stinnett started to walk through the security gate, applicant put his hand on Stinnett's shoulder and pulled Stinnett back to gain access to the courtyard in front of the building. When Stinnett asked applicant what he was doing, applicant told him: "Don't fuck with me. I'm a cop. I'll arrest you." Stinnett responded by telling applicant that he did not care who applicant was and that applicant could not come in if he did not have his own key. Applicant then told Stinnett: "I have business here. I'm a cop. I have business here."

Next, Stinnett told applicant that, if applicant had business at the building, applicant needed to speak with the manager. The manager is Pishgar. After Stinnett went to the telephone pad outside the security gate to call Pishgar, he looked through the glass in the building's front door and saw Pishgar and Kiana inside the lobby. Stinnett called out to Pishgar: "this man is trying to get into the building. He says he's a cop." Stinnett walked towards the front door, applicant followed him, and the security gate closed behind them.

Pishgar opened the front door of the building, and she and Kiana walked into the courtyard to see what was going on. The front door of the building closed and locked behind them. At that point, Pishgar, Kiana, Stinnett and applicant were in the courtyard. In a loud, booming voice, applicant said: "Open the fucking door. I'm a police officer." Pishgar

11

responded by telling applicant that he was not a police officer and asking applicant what he wanted. Defiant, applicant replied by stating something to the effect of: "Open the fucking door. I am police officer. I can arrest you if you don't comply."

Pishgar again asked applicant what he wanted. Applicant then "leaned into" Pishgar's ear and told her that he was there to serve documents regarding an unlawful detainer action on a Gary Levine and that a Rick Hossane had sent him to serve the documents on Levine. Pishgar told applicant that she did not have a tenant named Gary Levine, that she would know because she is the manager of the building, and that she did not know a Rick Hossane. These statements put applicant on notice that he was mistaken about something. As the manager, Pishgar would presumably know not only whether Gary Levine was one of her tenants, but whether a tenant by that name was so far behind on his rent that an unlawful detainer action was filed against him to have him removed from the premises.

Next, applicant told Pishgar that he did not believe her. Pishgar replied that she did not care what he believed, that she was the building manager, that he was trespassing, and that he had to leave. Pishgar then began to tell applicant something to the effect that the next time he wanted to enter a building or needed to serve someone, he should ring the manager's buzzer. But before she could complete such a sentence, applicant told her: "Bitch don't fucking tell me how to do my job." He then shoved her in the chest and knocked her into the building's front door. Pishgar shoved applicant back, and applicant began hitting Pishgar in the face and upper body with his fist and began shouting more obscenities at her (e.g., calling her a bitch). Pishgar fought back (hitting and scratching applicant in the face and neck) and unsuccessfully tried to get away.

After he hit her some seven to ten times, applicant pulled out a can of pepper spray and began spraying Pishgar in the head and face. He then sprayed towards Stinnett and

Kiana getting pepper spray on one side of Stinnett's face and neck and on the back of his arms and hands and getting pepper spray in Kiana's hair and under her arms.[7]

The last thing Pishgar saw before she was blinded by the pepper spray was applicant grinning at her. As she describes it, the grin was "just this incredible grin." Applicant pinned Pishgar in the courtyard and sprayed her with pepper spray at "point blank" range. He coated her eyes with it and sprayed it directly into Pishgar's mouth. She could feel the metal of the can "click" against her teeth as applicant sprayed the pepper spray directly into her mouth causing her "unbelievable agony swallowing, swallowing that pepper spray."

Applicant emptied the entire can of pepper spray on Pishgar, Stinnett, and Kiana. Throughout the attack, Kiana screamed and cried hysterically. Stinnett admitted that, throughout the time applicant attacked Pishgar, he stood by and did nothing to try and stop applicant or protect Pishgar.

Once applicant left, Stinnett helped Pishgar into the apartment building and then ran outside to get the license plate number off of applicant's car. A woman who was sitting in a car in front of the building and who witnessed the attack came into the building to help Pishgar and Kiana. They took Pishgar and Kiana upstairs to their apartment and put them in the bathtub and sprayed them with cold water. As a result of the commotion, a number of neighbors came into Pishgar's apartment. Stinnett called 911, and the police and an ambulance came. The paramedics went up to Pishgar's apartment and took her to the hospital by ambulance.

At the hospital, Pishgar's eyelids were clamped open and a machine flushed her eyes with fluids. In addition, ice packs were placed on Pishgar to try to cool her skin down. But,

---

[7]Applicant denies that Kiana was present during the attack and argues that, if she were there, she would have had pepper spray in her face and eyes, and not under her arms. Applicant's argument is not convincing. The absence of pepper spray in Kiana's face and eyes with pepper spray burns under her arms is consistent with Kiana putting her hands and arms up to shield her face and eyes from the pepper spray.

as Pishgar was informed, there is no antidote for pepper spray or treatment to stop the burning pain. Pishgar was discharged from the emergency room in the late afternoon. By early evening that same day, red blotches had developed on Kiana's face, arms, and neck.

Pishgar's pain lasted for four months. She developed a severe ear infection. She used prescription mouth and throat gargles to reduce the burning when she spoke or ate. She suffered severe breathing problems. She now suffers from permanent photosensitivity to the sun, which causes her to break out in huge red hives whenever her skin is exposed to the sun (even on cloudy days). The hives burn and itch and take approximately 20 to 30 minutes to subside once she gets out of the sun.

As a result of the attack, both Pishgar and Kiana became withdrawn and remained in their apartment alone. Kiana would no longer sleep alone and had bad dreams that woke her up. Kiana was very frightened that applicant would come back, so Pishgar told her that he was in jail to relieve her fear.

And although Stinnett had a small amount of pepper spray on him, he went to the beauty shop in which he works. He tried to work, but had to leave after he cut one client's hair. Even though Stinnett's physical injuries were nominal, he suffered mental distress. In addition, he suffered from substantial shame because he did nothing to help Pishgar. Stinnett admits that, for six months after the attack, he had to see a therapist once a week to help him deal with his shame and that he had to take a self-defense course so that he could "feel safe" again.

The hearing judge found that, during Pishgar's lawsuit, applicant attempted to videotape Pishgar's deposition and that that fact terrified Pishgar. The hearing judge also found that applicant threatened to have Pishgar arrested and made other vague threats against Pishgar. On review, the committee requests that we independently find that applicant did not threaten to have Pishgar arrested, but that applicant threatened to effect a citizen's arrest of

14

Pishgar and that, as a result of that threat, Pishgar and Kiana left their apartment and went into hiding for a period of time. The committee also requests that we "clarify" the findings to expressly provide that applicant's attempt to videotape Pishgar's deposition, threat to effect a citizen's arrest on Pishgar, and other vague threats are wrongful and "gross acts of misconduct."

We do not adopt the hearing judge's findings recited in the paragraph above. Nor do we make the finding or clarifications that the committee seeks. The Code of Civil Procedure expressly authorizes the taking of videotape depositions. And Pishgar's counsel in the civil proceeding admits that applicant properly noticed Pishgar's deposition as a videotape deposition. He, however, failed to communicate this notice to Pishgar. Accordingly, the committee failed to carry its burden to prove that applicant committed a wrongful act or "gross act of misconduct" when he attempted a videotape deposition of Pishgar.

Furthermore, while applicant admits that he told Pishgar's counsel that he might effect a citizen's arrest on Pishgar, he contends that he was justified in doing so because (1) he signed a criminal complaint against her for allegedly fabricating evidence in the Pishgar lawsuit to increase her damages claim by $350 and (2) the police told him he could effect a citizen's arrest on her. In the hearing department, applicant testified and presented evidence which he claims shows that Pishgar fabricated a receipt, on a sheet of letterhead from a realty company, for a $350 non-refundable deposit on the rental of a vacation condominium; that she forged the signature of a realty company employee named Pete Pattis (Pattis) on that receipt; and that she produced a copy of the receipt in a verified response to one of applicant's discovery requests in the Pishgar lawsuit. The committee did not present any evidence to rebut applicant's claim of justification. Accordingly, the committee failed to carry its burden to clearly prove that applicant's statements to Pishgar's attorney were wrongful or involved "gross misconduct" as it alleges.

15

Like the hearing judge, we conclude that the facts and circumstances surrounding applicant's attack on Pishgar, Stinnett, and Kiana involve moral turpitude and alone rebut his prima facie showing of good moral character. Applicant impersonated a police officer to Stinnett and Pishgar and misrepresented to them that he had official police business in their apartment building. Then, when they would not accept his impersonation as a police officer and while he was trespassing on private property managed by Pishgar, applicant viciously attacked Pishgar by hitting her in the face with his fists and spraying her with pepper spray, all without provocation or justification. Moreover, applicant's attack on Pishgar was accompanied by his attacks on a five-year-old child and on a man applicant describes as sickly and suffering from a chronic illness. When Pishgar sued applicant and others over the attack, applicant filed and prosecuted a cross-complaint against Pishgar and Stinnett alleging that they assaulted and battered him. Applicant's pursuit of his cross-complaint was a deliberate continuation of his abuse of and harm to Pishgar and Stinnett.

### 2. Pishgar's and Stinnett's Testimony is Credible While Respondent's Testimony Lacks Credibility and Candor

As noted above, after independently reviewing the record without considering or relying on applicant's nolo contendere plea and conviction of misdemeanor battery, we find that Pishgar's and Stinnett's testimony is credible, while applicant's testimony lacks credibility and candor. In doing so, we recognize that there is a clear distinction between credibility and candor. (See, e.g., *Franklin v. State Bar* (1986) 41 Cal.3d 700, 708 & fn. 4.) The determination of a witness's credibility (i.e., believability) is primarily within the province of the hearing judge to determine as he or she saw and heard the witness testify (rule 305(a)), while the determination of a witness's candor (i.e., truthfulness) must ordinarily be shown by clear and convincing evidence (cf. Rules Proc. of State Bar, title IV, Stds. for Atty. Sanctions for Prof. Misconduct, stds. 1.2(e), 1.2(e)(v), 1.2(b), 1.2(b)(vi); but see *Siegel v. Committee of Bar Examiners* (1973) 10 Cal.3d 156, 178-179 [in cases involving

16

an applicant's exercise of a First Amendment right of free speech, the committee must prove the applicant to be lying beyond a reasonable doubt]).  Even though a witness's candor must ordinarily be shown by clear and convincing evidence, great weight is still given to the hearing judge's finding on candor.  (*Franklin v. State Bar, supra,* 41 Cal.3d at p. 708.)

Unless a witness admits to lying, proving that he or she lied is seldom capable of being proved with direct evidence.  Circumstantial evidence is sufficient to prove that a witness's testimony in the State Bar Court lacks candor so long as the circumstantial evidence is clear and convincing.  (Cf. *Medoff v. State Bar* (1969) 71 Cal.2d 535, 550-551 [professional misconduct may be established by circumstantial evidence]; *Utz v. State Bar* (1942) 21 Cal.2d 100, 103; see also *Geffen v. State Bar* (1975) 14 Cal.3d 843, 853 [intent may be established by direct or circumstantial evidence]; but see *Siegel v. Committee of Bar Examiners, supra,* 10 Cal.3d at pp.178-179 [in First Amendment cases proof of lying must be beyond a reasonable doubt].)

In independently determining that applicant's testimony in the hearing department lacks both credibility and candor, we have considered, inter alia, the following factors:

### a.      Hearing Judge's Credibility Determinations

We first consider the credibility and candor determinations made by the hearing judge, who saw and heard the parties testify.  Substantial weight is given to this factor.  (Rule 305(a) [review department gives great weight to hearing judge's findings resolving issues of credibility]; *Franklin v. State Bar, supra,* 41 Cal.3d at p. 708.)  However, because we do not address the propriety of the hearing judge's consideration and reliance on applicant's nolo contendere plea and conviction, we do not rely on her findings that applicant's testimony lacks credibility and candor.  Yet, we do rely on and afford deference to her findings that Pishgar's and Stinnett's testimony is credible.  This is important because Pishgar's and

Stinnett's testimony directly conflicts with applicant's testimony in most all material respects.[8]

We reject applicant's attempt, on review, to impeach Pishgar's testimony with the evidence that allegedly shows that she fabricated a receipt from Pattis for a $350 non-refundable deposit on a vacation condominium and produced the receipt to applicant during discovery in the Pishgar lawsuit. Even though we considered that evidence with respect to applicant's claim that he was "justified" in telling Pishgar's attorney that he might effect a citizen's arrest on Pishgar, we, just like the hearing judge, refuse to consider it to impeach Pishgar's credibility.

Contrary to applicant's contention, he was not entitled to "generally impeach" Pishgar's credibility with the evidence regarding the $350 receipt. (Evid. Code, § 787 [except for felony convictions admissible under Evidence Code section 788, specific instances of a witness's misconduct are not admissible to prove a trait of character to attack the witness's credibility in civil proceedings]; 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 1997) Attacking and Supporting Credibility of Witnesses, § 28.34, p. 525 (hereafter Jefferson); Steen v. Santa Clara Valley Mill & Lumber Co. (1901) 134 Cal. 355, 356-357 [evidence that witness attempted to defraud his employer was inadmissible for impeachment purposes].) The only evidence that is admissible to "generally impeach" a witness's credibility is (1) evidence showing that the witness has a reputation of not telling the truth and (2) personal-opinion testimony from an individual who does not believe that the witness is truthful. (Jefferson, supra, at p. 525.) Applicant, however, did not proffer any such evidence to attack Pishgar's credibility.

---

[8]While independently reviewing the record and making our credibility determinations as to Pishgar and Stinnett, we viewed their testimony with caution in light of applicant's claims that they bear grudges against him and testified against him out of spite.

Moreover, even assuming arguendo that the evidence regarding the $350 receipt was admissible to impeach Pishgar's credibility (whether generally or otherwise), we would not consider it for that purpose because applicant did not proffer it while Pishgar was testifying so that she would have an opportunity to explain or deny it. Applicant did not proffer the evidence until the day after Pishgar completed her testimony and was excused.

We reject applicant's contention that the hearing judge improperly prevented him from fully cross-examining Pishgar when she sustained the committee's objection to applicant's question to Pishgar on cross-examination as to whether Pishgar was acquainted with Pattis. The committee objected to the question on the grounds that it was beyond the scope of direct examination. If applicant thought that the question had a proper purpose, he should have called that fact to the hearing judge's attention at that time by making an offer of proof. (See People v. Burton (1961) 55 Cal.2d 328, 344-345; People v. Coleman (1970) 8 Cal.App.3d 722, 729-731.) Having failed to do so and having immediately moved on to another line of questioning, applicant has no basis on which to complain. In sum, we have carefully reviewed applicant's cross-examination of Pishgar and reject his claim that the hearing judge improperly restricted it.[9]

---

[9]To support his contention that Pishgar's testimony is not credible, applicant improperly cites to and relies on, in his opening brief, portions of Pishgar's deposition in the Pishgar lawsuit. Even though a copy of Pishgar's deposition is included in Exhibit 6, which is a certified copy of the official court file in the Pishgar lawsuit, the hearing judge admitted Exhibit 6 by taking judicial notice of it as authorized by Evidence Code section 452, subdivision (d). (The hearing judge admitted Exhibits 1 through 6 into evidence by way of judicial notice.) When a hearing judge admits a copy of a court file into evidence by taking judicial notice of it, she may take judicial notice of the existence of each document in the file, but she may not take judicial notice of the truth of the facts asserted in those documents unless the document is an order, judgment, or recitation of the findings of facts and conclusions of law in the case. (People v. Thacker (1985) 175 Cal.App.3d 594, 599; see In the Matter of Kizer (Review Dept. 1990) 1 Cal. State Bar Ct. Rptr. 87, 94.) During trial, the hearing judge repeatedly informed the parties of the foregoing evidentiary principles. And she repeatedly told them that, if they wanted her to consider the facts asserted in a "non-order, non-judgment type document," they would have to proffer that document separately. Accordingly, if applicant wanted to rely on the facts asserted in the transcript of the preliminary hearing that is included in Exhibit 6, he was required to proffer that transcript as

In addition, we reject applicant's attempt, on review, to impeach Pishgar's testimony with the statement in his opening brief that "Pishgar exaggerated and fabricated a lot of evidence, and thus should not be believed. She has done so in the past out of greed in order to squeeze cash settlements from other defendant's who she has sued and chose, falsely, to involve her daughter in in [sic.] order to gain sympathy and even larger awards, even though her daughter was not actually involved." Applicant does not support these "libelous" statements in his opening brief with citations to the record. And our review of the record discloses that there is no evidence whatsoever to suggest, much less support, applicant's statements. Applicant's advancing such statements that are prejudicial to the honor or reputation of a witness without any just cause is evidence of bad moral character, which is directly relevant to the practice of law. (See Bus. & Prof. Code, § 6068, subd. (f) [attorneys must not advance facts "prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he or she is charged"].)

We also reject applicant's claims that Stinnett's testimony is not credible because Stinnett gave "conflicting" statements as to where the attack took place.[10] In his written statement to the police, Stinnett wrote that, after the attack, he dragged Pishgar into the "foyer" (Stinnett uses the term "foyer" to refer to the courtyard -- the outdoor area between the security gate and the front door of the apartment building). However, at Stinnett's deposition in the Pishgar lawsuit and on direct examination in the hearing department, Stinnett testified that, after the attack, he helped Pishgar into the "lobby" of the apartment building. At his deposition in the Pishgar lawsuit and on cross-examination in the hearing department, Stinnett explained the discrepancy by stating that he incorrectly used the word

---

a separate exhibit at trial. He did not do so.

[10]In his opening brief, applicant again misstates the record by stating (without any record citation) that Stinnett "falsely testified that Applicant sprayed a child [Kiana] in the face. . . ." Stinnett did not testify that applicant sprayed Kiana in the face.

"foyer" in his police statement and that he meant to use and should have used the word "lobby."

The hearing judge, who saw and heard Stinnett testify, obviously concluded that Stinnett's incorrect use of the word "foyer" on his police statement was accidental and did not impeach his credibility. We agree.[11]

We further note that Stinnett's credibility is bolstered by his "declarations against interest" (cf. Evid. Code, § 1230) that he stood by while applicant attacked Pishgar and did nothing to help her or stop applicant; that, for six months following the attack, he had to see a therapist once a week to help him deal with the shame he suffered from not helping Pishgar; that he developed a mild level of paranoia; and that he had to take a self-defense course to help himself "feel safe" again.

### b.    Witnesses' Interests in Outcome

We also consider the fact that applicant is the witness with the most "interest" in the outcome of this proceeding. (Evid. Code, § 780, subd. (f).)

### c.    Applicant's Testimony is Not Believable

Applicant's testimony on most of the material issues is not only implausible, but unbelievable. (Evid. Code, § 780, subd. (b).) We consider this as strong circumstantial evidence that applicant's testimony lacks credibility and candor.

---

[11]To support his contention that Stinnett's testimony is not credible, applicant improperly cites to and relies on, in his opening brief, portions of the deposition of a police officer that was taken in the Pishgar lawsuit and which was included in Exhibit 6. As noted above in footnote 10, Exhibit 6 is a certified copy of the court file in the Pishgar lawsuit, which the hearing judge admitted by way of judicial notice. As further noted in footnote 9, respondent (1) knew that he was required to proffer separately the police officer's deposition transcript if he intended to rely on it and (2) knew that he did not do so. Therefore, applicant's citations to the officer's deposition is evidence of bad moral character.

On direct examination, applicant testified as follows: That while he, Pishgar, and Stinnett were standing in the courtyard,[12] he told Pishgar that he was there to serve a summons on "Gary Levine" (that he "gave her the name on the summons"). That Pishgar told him that "there's no Gary Levine in this place." That he then asked Pishgar whether she was really the manager of the building and that she told him "yes" and to "get out"; to which applicant replied "something to the effect of, 'I'm going to be back, and hopefully I'm not going to see you and this jerk [Stinnett] here.'"

Applicant further testified on direct that, after he made the statement that he would be back, he saw a hand coming towards and clawing at his face and then "felt a hit to the head." That the "hit to [his] head": (1) made his glasses fly off and out to the sidewalk and (2) threw him from the courtyard "onto the sidewalk." That he then stumbled and fell, that Pishgar was all over him, that she was clawing him, and that Stinnett was making motions indicating that Stinnett was going to attack him. That he then got up and started running backwards, but that Pishgar managed to grab him with one hand and pressed her thumb into his throat, so he reached into his fanny pack, took out his pepper spray, and spayed her with it. That Stinnett then started chasing him in between cars calling him a "motherfucker." That Stinnett tried to kick one of the windows in applicant's car.

Further, applicant testified on direct that, once he was able to get in his car, he drove off, found a payphone, called 911, and told the 911 operator what happened. That the operator told him to go back and wait near 600 Fell Street (presumably for the police and paramedics to arrive). That he went back about 50 feet from 600 Fell Street and that the police and paramedics arrived shortly thereafter. That he was sitting on the sidewalk experiencing extreme pain in the right side of his head. That the paramedics put iodine on

---

[12]Applicant uses the words "vestibule" or "foyer" to refer to the courtyard. As we did above, we use the term courtyard because it more accurately describes the area.

some scratches that were on his face and throat. That because his hands were burning from the pepper spray, the paramedics also gave him some water with which to rinse his hands. That, when the paramedics asked him if he wanted to go to the hospital, he told them no.

Applicant's account of the altercation and attack is implausible and unbelievable. Pishgar, a single mother, is 5 feet 3 inches tall and, at the time of the attack, weighed only 110 pounds. At the time of the attack, Kiana was 5 years old, 3 feet tall, and weighed 55 pounds. The record does not contain Stinnett's physical size, but applicant testified that, at the time of the attack, Stinnett was a "punk rocker" with purple and red hair and wearing earrings, that Stinnett was perspiring heavily, and that Stinnett looked sickly -- as though he were "suffering from some sort of chronic illness." (Emphasis added.)

Applicant, on the other hand, was 31 years old at the time of the attack. Moreover, only 10 years before the attack, he was honorably discharged from the Israel Defense Force after serving 3 years as an infantry fighter and communications director.[13] It is simply implausible and unbelievable that a 5-feet-3-inch, 110-pound single mother with her 5-year-old daughter present and someone applicant described as a sickly punk-rocker suffering from a chronic illness would, either individually or together, viciously and without provocation attack a 31-year-old former infantry fighter under any circumstances, much less under the circumstances to which applicant testified. Furthermore, it is simply implausible and unbelievable that Pishgar and Stinnett, either individually or collectively, could have attacked applicant with such prowess so as to throw him from the courtyard onto the sidewalk. Nor could Pishgar, with only one hand, grab and hold applicant by the throat so that he could not break away and had to use pepper spray to defend himself as he contends.

---

[13]Applicant professes that he "was an excellent solider in the Israeli Military." (Emphasis added.)

Moreover, even if we were able to conclude that Pishgar and Stinnett might have plausibly instigated an attack on applicant as applicant testified, Stinnett would have sustained more than just minor pepper spray burns, and applicant would have suffered more than just scratches on his face and throat and head pain. In his opening brief, applicant contends that "[a] review of Applicant's paramedic report demonstrates that Applicant was viciously attacked by Susan Pishgar and [Stinnett]." Applicant's contention is not only meritless, it misstates the record. Applicant cites Exhibit J as his paramedic report. Exhibit J is not applicant's paramedic report, it is merely a copy of the billing that he received from the City of San Francisco. The billing shows only that the city billed applicant its "base rate" of $126 for emergency treatment services. We discredit applicant's claim of head injury because he did not corroborate it with a copy of his paramedic report or other medical record, because he did not go to the hospital for treatment, and because he did not testify that the paramedics treated him for a head injury.

### d.    Applicant Did Not Call the Independent Witness

The only "true" independent witness of the altercation and attack was the woman who witnessed the incident while sitting in her car in front of 600 Fell Street and who helped Pishgar and Kiana up to their apartment. This witness could have corroborated applicant's claim that the attack occurred on the sidewalk and not in the courtyard. However, applicant did not proffer her as a witness; nor has he explained why he did not do so. (See, generally, Evid. Code, § 412 ["If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust."].)

### e.    Conclusion: Applicant's Testimony Lacks Credibility & Candor

In conclusion, the evidence clearly and convincingly establishes that applicant's testimony in this admissions proceeding regarding the July 1996 altercation and attack lacks

credibility and candor. Applicant's deliberate presentation of false testimony under oath in the State Bar Court is very serious misconduct, which may well be more egregious than his attack on Pishgar, Kiana, and Stinnett. (*Franklin v. State Bar, supra,* 41 Cal.3d at p. 712 (dis. opn. of Lucas, J.) [Supreme Court has repeatedly noted "that deception of the State Bar may constitute an even more serious offense than the conduct being investigated"].) We reject applicant's contention that we cannot find his testimony to be deliberately false because his testimony is based on a claim of innocence.

We are aware that "[s]pecial problems arise when a finding of falsehood is based upon a denial of guilt." (*Martin B. v. Committee of Bar Examiners* (1983) 33 Cal.3d 717, 724.) Applicant testified as to his version of the altercation and attack and asserted his innocence. This does not shield him from a finding that he deliberately gave false testimony in this proceeding. To conclude otherwise would promote dishonesty by allowing applicants to testify falsely in hopes that their lies will be believed, but protecting them from any repercussion if their lies are discovered.

Applicant's reliance on *Pacheco v. State Bar* (1987) 43 Cal.3d 1041, 1055-1056, to support his contention that his claim of innocence protects him from a finding that he lied in the hearing department is meritless. The relevant holding from *Pacheco,* and the cases cited therein, is that it is often inappropriate to deny admission to an applicant who, having previously been adjudicated guilty of wrongdoing, refuses to retract his claims of innocence and make a showing of repentance. (*Id.* at 1056.) Unlike Pacheco, applicant has not previously been adjudicated guilty of any wrongdoing. Even though applicant was convicted of misdemeanor battery, his conviction was based on his nolo contendere plea and not an adjudication of guilt.

In sum, we have thoroughly reviewed the record in this case and see no fundamental unfairness in the proceedings below. Nor do we see any fundamental unfairness in our

independently finding that applicant deliberately presented false testimony with respect to the altercation and attack and that his presenting that false testimony alone rebuts his prima facie showing of good moral character.[14]

## B.    Applicant's Lawsuits Against Safeway & Misconduct Towards Safeway's Counsel

In 1993, applicant was panhandling for money in front of a Safeway grocery store in San Francisco. The manager of the store told applicant to leave and called the San Francisco Police. Applicant also called the San Francisco Police. When the police arrived, they instructed applicant to leave. Thereafter, applicant sued Safeway in the United States District Court for the Northern District of California (the Safeway lawsuit).

In January 1994, the United States District Judge who presided over the Safeway lawsuit (the district judge) dismissed the lawsuit for want of prosecution (e.g., applicant failed to appear at a scheduled status conference). Applicant re-filed the action in March 1994. On August 5, 1994, the district judge granted applicant's motion to amend his complaint. In her order granting applicant's motion, the district judge specifically cautioned applicant that, if he failed to withdraw any spurious claims within 30 days and she thereafter found that no basis existed for any claim the defendants sought to dismiss, she would impose sanctions on him in the form of costs and attorney's fees. The district judge had previously cautioned applicant that his claims against Safeway appeared "spurious" and that his prosecution of such spurious claims would adversely reflect upon his application of admission to practice law.

---

[14]Compare *Martin B. v. Committee of Bar Examiners, supra,* 33 Cal.3d at pages 720 through 726 where the Supreme Court invalidated the State Bar Court's findings that the applicant was guilty of rape and that he lied in the State Bar Court. The Supreme Court held that it was unfair for the State Bar Court to retry the applicant on rape charges as to which the applicant had received a favorable termination after trial 9 or 10 years earlier because, with respect to the criminal trial, no transcript existed, no reporter notes were kept, certain witnesses were unavailable, the evidence introduced had been destroyed, and the trial judge was deceased.

Furthermore, even John Dahlberg (Dahlberg), attorney for Safeway, advised applicant that applicant's case was meritless under the authority of *Collins v. Womancare* (9th Cir. 1989) 878 F.2d 1145. Dahlberg asked applicant to read the case and research the matter. But applicant responded by saying something to the effect of "I sue first and see what happens."

Notwithstanding the repeated warning to applicant that his claims were spurious, he did not withdraw any of his claims. And, on August 19, 1994, he filed his amended complaint alleging that Safeway, its private security guards, and 99 Doe defendants violated his civil rights under color of state law (42 U.S.C. § 1983), that Safeway conspired with its private security guard and the San Francisco Police to deprive him of his rights (42 U.S.C. § 1985), and that Safeway failed to prevent the alleged violation of his civil rights (42 U.S.C. § 1986).

In an order filed in December 1994, the district judge found that applicant's complaint did not state a claim, denied a second motion for leave to amend complaint that applicant filed, and granted Safeway's motion to dismiss with prejudice. In addition, the district judge found that applicant abused the courts in violation of rule 11 of the Federal Rules of Civil Procedure and enjoined him from filing any more actions based on any of the facts involved in the Safeway lawsuit.

In early 1995, applicant filed various motions in the Safeway lawsuit (e.g., motion for reconsideration of the dismissal, motion to recuse the district judge, motion for sanctions against Safeway). In May 1995, the district judge denied all of applicant's motions and Safeway's motion to have applicant declared a vexatious litigant, but granted Safeway's motion for costs and attorney's fees and awarded Safeway $10,782.89 in sanctions against applicant.

Applicant appealed the district judge's sanctions order. In August 1996 the United States Court of Appeals for the Ninth Circuit held that the district judge did not abuse her

discretion by imposing sanctions and affirmed her order. The district judge's sanctions order is final.

The hearing judge held under principles of collateral estoppel that applicant was bound, in this proceeding, to the district judge's prior finding that his lawsuit against Safeway was frivolous and pursued for the purpose of harassment. We disagree. The committee failed to carry its burden to establish that the district court's sanction findings were made under the clear and convincing standard of proof. Moreover, as we have recently cautioned, it would appear inappropriate to apply principles of collateral estoppel to sanctions orders unless the sanctions issues were litigated in a full evidentiary hearing. (*In the Matter of Lais* (Review Dept., Apr. 17, 2000, 94-O-13983) 4 Cal. State Bar Ct. Rptr. ___, ___ [p. 8].) The record in this Safeway lawsuit indicates that no such full evidentiary hearing was held. For the foregoing reasons, we sustain applicant's contention that the hearing judge erred in applying principles of collateral estoppel to the district judge's sanctions findings.

Moreover, we reject the committee's contention that the evidence otherwise establishes that applicant pursued the Safeway lawsuit for purposes of harassment because it was completely void of merit. Even if we found that the Safeway lawsuit was void of merit, we would be hesitant to hold it as clear evidence of bad moral character.

Even though we do not find that applicant's filing and prosecuting the Safeway lawsuit is evidence of bad moral character, we find that many of his actions revolving around it involve moral turpitude and are clear evidence of bad moral character. First, applicant made two misrepresentations of law to the district judge. In his memorandum of points and authorities in opposition to Safeway's motion to dismiss, applicant misrepresented a holding in *Collins v. Womancare, supra*, 878 F.2d 1145. In his pleading, applicant quoted from *Collins* as holding that "a private citizen who effectuates a citizen's arrest is performing a function of the state and acts under color of state law." (*Id.* at p. 1148.) However, contrary

28

to applicant's representation, that quote was not a holding of the court of appeals, but was clearly a quote from the lower court's decision, which the court of appeals reversed.

In that same memorandum, applicant also misrepresented, to the district judge, the holding in *Hudgens v. National Labor Relations Board* (1976) 424 U.S. 507. In his memorandum, applicant stated as follows: "In Hudgens. . . the court [in reviewing its opinion in *Amalgamated Food and Employees Union v. Logan Valley Plaza* (1968) 391 U.S. 308] specifically indicated that if there is no effective alternative to the chosen place, the place shall be open for freedom of expression, even though the property is privately owned." (See *Hudgens, supra*, 424 U.S. at pp. 517-518.) Even though applicant's statement as quoted above is a correct statement of the law as set forth in *Logan Valley*, the Supreme Court not only expressly rejected *Logan Valley* in *Hudgens, supra*, 424 U.S. at pages 518-519, but made it clear that it had previously overruled *Logan Valley* sub silentio in *Lloyd Corp. v. Tanner* (1972) 407 U.S. 551.

Such clear misrepresentations to the district judge are serious misconduct regardless of whether she was actually deceived by them. And such misrepresentations are strong evidence of bad moral character because they directly reflect on applicant's fitness to practice law. (See Bus. & Prof. Code, § 6068, subd. (d) [attorneys must never seek to mislead a judge by an artifice or false statement of fact or law]; Rules Prof. Conduct, rule 5-200(B), (C) & (D).)

Second, applicant threatened Dahlberg with lawsuits against a group of various entities if Safeway did not agree to settle the lawsuit. Dahlberg informed applicant that his threat amounted to extortion. Included in the group of entities applicant threatened to sue was Home Depot, whose only contact with the lawsuit was as a client of Dahlberg's law firm, Dillingham & Murphy (D&M). In addition, Dahlberg is a reserve police officer for the Oakland Police Department, and applicant threatened to file and did file a baseless complaint

against him with the Oakland Police. This threat came about because, early in the Safeway lawsuit, Dahlberg told applicant that he was a reserve police officer and tried to explain to applicant how arrests are made by the police so that applicant would understand the conduct of the police in the Safeway incident. Subsequent to this explanation, applicant repeatedly and falsely accused Dahlberg and Safeway of threatening him with the fact that Dahlberg was a police officer.

Third, applicant threatened to sue Dahlberg and D&M for punitive damages if Dahlberg did not provide "written assurances" that he would prepare a stipulation to seal a portion of applicant's deposition in the Safeway lawsuit. Fourth, applicant threatened to sue Dahlberg and a court reporting firm for price fixing if he was not provided deposition transcripts at a price below the court reporting firm's customary prices.

Fifth, applicant placed numerous harassing telephone calls and wrote numerous harassing letters to Dahlberg, repeatedly threatening further lawsuits against him, Safeway, and others.

Sixth, as further evidence of applicant's intent to continually harass Dahlberg and D&M, applicant went to D&M's offices on August 22, 1995, after business hours to serve Dahlberg and Tom Martincheck (Martincheck), a D&M associate attorney, with summons and copies of a complaint that Valco Purlantov (Purlantov) filed against Safeway in propria persona. When applicant arrived at D&M's offices, he was disruptive, abusive to D&M's staff, and trespassed in private areas in the office. Despite being asked to leave, applicant walked around looking in individual attorney offices, knocked on the door to a conference room in which a D&M partner was having a meeting, opened the door, and "stuck" his head in "looking for someone." Applicant indicated that he was looking for Dahlberg and Martincheck. The partner asked applicant to wait in the reception area while he went to look

for them. The partner aptly described applicant as being very agitated and as "a scary individual."

After he was told that Dahlberg was out of the office and Martincheck was busy, applicant continued to look into the offices demanding to see them. Applicant was loud and boisterous and created a scene demanding to see them. When Martincheck appeared to be served, applicant was on the phone in the reception area. Applicant then "demanded" that Martincheck provide him with identification and insisted on taking Martincheck's photograph. The partner told applicant that he would give Martincheck the summons and complaint and told Martincheck to go back to his office because applicant's demands were not appropriate and because he was not going to permit applicant to take Martincheck's picture. Martincheck then went back to his office.

While he was in the reception area, applicant spoke on the telephone with Dahlberg, who had just called the office. After that conversation, the partner then accepted service for Dahlberg and Martincheck and gave applicant a written statement to that effect using language similar to that approved for accepting and acknowledging service under the Code of Civil Procedure.

Even though applicant was repeatedly asked to leave, he refused to do so. Accordingly, D&M had to get building security to physically escort applicant out of its offices and the building. Because of applicant's abuse and threatening behavior, D&M had to hire a security guard to protect its offices for several days.

The following morning, Dahlberg received a voice mail message from applicant. In that message, applicant threatened that, if Dahlberg did not contact him by that Friday at noon, he was going to actively and aggressively look for Dahlberg to serve him. In the voice mail, applicant also stated that he knew Dahlberg was in his office because he (applicant) had taken photographs of Dahlberg earlier that morning. Applicant's explanation of his message

31

is meritless and implausible. Applicant's voice mail clearly implied to Dahlberg that applicant was following and spying on him.

Even though a partner in Dahlberg's firm had accepted service for Dahlberg, applicant sent Dahlberg a letter dated August 23, 1995, stating that he was still not satisfied and requesting that Dahlberg sign this letter and fax or mail it back to him. If not received by noon on Friday, he would begin to aggressively search "for you and Tom in order to serve you with the papers."

Ultimately, Dahlberg and Martincheck were forced to seek a harassment injunction order against applicant in the Superior Court of San Francisco. Applicant filed a cross-complaint against Dahlberg, Martincheck, D&M partner Mitchell Greenberg, Safeway, and Safeway's in-house counsel accusing them of "harassment and intimidation in order to complicate Simon Levi's Moral Character Application with the State Bar of California." Also, applicant named a D&M receptionist whom he frightened by his actions in D&M's reception area on August 22, 1995. There is no credible evidence that indicates that any of these individuals harassed or intimidated applicant or that applicant had any just cause for filing his cross-complaint.

Dahlberg and Martincheck hired a private security guard to accompany them to court on their petition for a harassment injunction against applicant. On September 9, 1995, a superior court commissioner issued a three-year harassment injunction against applicant. In issuing the injunction order, the commissioner told applicant that his conduct was inappropriate for somebody who wants to become a member of the legal profession. She plainly told applicant that "this type of conduct could easily jeopardize your admission to the bar at such time as you apply."

Applicant appealed the three-year injunction and then dismissed his cross-complaint. The court of appeal affirmed the three-year injunction. In March 1998 applicant moved to have the injunction dissolved, but his motion was denied.

On October 10, 1995, applicant sent Purlantov to D&M's offices to serve documents related to applicant's cross-complaint. Similar to applicant, Purlantov disrupted D&M's office and was abusive and threatening to D&M's staff, but Purlantov's conduct was substantially more egregious. For example, Purlantov "terrorized" Rosemary Jones-Shine (Jones-Shine), one of D&M's secretaries, by raising his hand at her as though he was going to hit her.

The next day (October 11, 1995) applicant sent Dahlberg a letter addressed "Dear Officer Johnnie" in which applicant falsely stated that Jones-Shine was "abrupt, rude, vulgar, barbarous and insulting" to Purlantov when he was in D&M's offices to serve Dahlberg and Martincheck. Applicant went on to state in his letter that "if this kind of negative attitude continues, I will have to take corrective measures against you, Miss. Jones and your staff with the San Francisco Superior, or with the Ninth Circuit." Applicant also sent a letter to Dahlberg addressed to "Dear Johnnie" with a "P.S. regards from Valco [Purlantov]." In light of Purlantov's abusive behavior at D&M's offices, Dahlberg and Martincheck obtained a modification to the restraining order on October 27, 1995, to prohibit applicant from sending Purlantov to D&M's offices for any purpose.

We decline the committee's request to make a finding that applicant engaged in an act of moral turpitude when he sent Purlantov to D&M's offices on October 10, 1995, because "applicant knew or should have known that Purlantov would engage in harassing behavior." The evidence indicates that, prior to October 10, 1995, Purlantov had been in D&M's offices on a number of occasions without incident. Thus, we cannot conclude that the evidence clearly establishes that applicant knew or should have know that Purlantov would engage in

inappropriate behavior at D&M's offices. Nonetheless, we find that applicant's October 11, 1995 letter to Dahlberg in which applicant falsely stated that Jones-Shine was "abrupt, rude, vulgar, barbarous and insulting" to Purlantov is additional evidence of applicant's wrongful harassment of Dahlberg and, therefore, evidence of bad moral character. Furthermore, applicant's conduct surrounding the Safeway lawsuit clearly involves moral turpitude and alone rebuts applicant's prima facie showing of good moral character.

We do not adopt the hearing judge's finding that applicant lacked candor by trying to seal various court orders. Regardless of whether applicant's motions to seal the orders were granted, applicant would have still been required to disclose the orders and their content to the committee on his application for moral character determination. (See Application for Determination of Moral Character, question 11.3 & Form 1 attachment.) And the committee was and is authorized to obtain copies of the complete order under the authorization and release that applicant executed as part of his application for moral character determination. To conclude that applicant would have failed to disclose the entire sanction order to the committee if his motions were granted would be mere speculation, not clear evidence of lack of candor.

## C.    Conclusion on Committee's Rebuttal Case

As indicated above, we conclude that (1) the facts and circumstances surrounding applicant's July 1996 attack on Pishgar, Stinnett, and Kiana; (2) applicant's false testimony in the State Bar Court regarding his attack on Pishgar, Stinnett, and Kiana; and (3) applicant's misconduct surrounding the Safeway lawsuit all involve moral turpitude and individually, as well as collectively, rebut applicant's prima facie showing of good moral character.

## IV. Applicant's Rehabilitation

As we noted above, the amount of evidence required to establish an applicant's rehabilitation varies according to the seriousness of the misconduct that was used to rebut the applicant's prima facie showing. (*In re Gossage, supra,* 23 Cal.4th at p. 1096; *In re Menna, supra,* 11 Cal.4th at p. 987.)

## A.    Restitution

With respect to the $10,782.89 in sanctions that the district judge awarded Safeway to reimburse Safeway for the reasonable costs and attorney's fees it incurred in relation to its motion to dismiss, the hearing judge found that, over the years, applicant has given Dahlberg six "official checks" totaling $10,000 that were drawn on California Federal Bank and made payable to Safeway. The hearing judge's findings are not completely correct. While applicant did give Dahlberg those six checks, he did not do so over the years, but only on the eve of the trial in this proceeding. Each of the six checks applicant admitted into evidence was issued in 1999. The record does, however, indicate that, over the years, applicant sent Dahlberg checks for small sums of money, but they were tendered to Dahlberg with various restrictions not agreed to by Safeway (e.g., that Safeway agreed to accept some "un-agreed" upon sum in full satisfaction of the district judge's sanction award). Applicant's failure to make any "non-restricted" payments to Safeway until the eve of trial in this matter belies his claim of rehabilitation based upon restitution. (Cf. *Warner v. State Bar* (1983) 34 Cal.3d 36, 47 [restitution made as a matter of expediency or under the pendency of disciplinary proceedings is not a mitigating circumstance].) Moreover, the fact that Safeway had a district court order awarding it the $10,782.89 diminishes the rehabilitative value of applicant's payments. As we held in *In the Matter of Ike, supra,* 3 Cal. State Bar Ct. Rptr. at page 490, an attorney's compliance with a criminal restitution order, no matter how timely, is not a mitigating circumstance. To conclude otherwise would be to reward the attorney for merely

35

complying with the court's restitution order. (*Ibid.*) This reasoning is applicable to the civil sanctions imposed on applicant by the district court because they were imposed to reimburse Safeway for the reasonable expenses and attorney's fees it incurred as a result of applicant's misconduct. (See *Sorensen v. State Bar* (1991) 52 Cal.3d 1036, 1044-1045 [restitution order in attorney disciplinary proceeding may include reasonable expenses and attorney's fees incurred as a result of the attorney's misconduct].)

As the hearing judge also correctly found, Dahlberg did indicate that, if Safeway could verify that each of the six checks was paid upon presentment, it would provide applicant with a release of judgment even though $10,000 is less than the full amount of the sanctions award and even though it does not include any interest. (See, e.g., *Martin v. State Bar* (1991) 52 Cal.3d 1055, 1064 [restitution order should ordinarily require the payment of interest].) While Safeway's agreement to accept substantially less than it is legally entitled to receive may relieve applicant of his legal obligation to pay Safeway the full $10,782.89 plus interest, it does not relieve him of his moral obligation to make full restitution, which should include interest. (Cf. *In the Matter of Distefano* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 668, 674 [because attorneys' responsibilities differ from those of laymen, attorneys may "be required to make restitution as a moral obligation even when there is no legal obligation to do so"].) Thus, applicant's failure to make full restitution to Safeway belies his claim of rehabilitation based upon restitution.

The hearing judge correctly found that applicant paid $13,000 in damages to Pishgar and $2,000 in damages to Kiana in accordance with the terms of the coordinated settlement agreement, which resolved the Pishgar lawsuit and applicant's criminal case. Like the hearing judge, we conclude that applicant's payments to Pishgar and Kiana have little positive probative value with respect to applicant's claim of rehabilitation because they were made under the pressure of the coordinated settlement agreement, which has the characteristics of a

criminal restitution order. (Cf. *Warner v. State Bar, supra,* 34 Cal.3d at p. 47; *In the Matter of Ike, supra,* 3 Cal. State Bar Ct. Rptr. at p. 490.) In our view, it would be inappropriate to reward applicant with rehabilitative credit merely for doing what he was already legally required to do as part of his criminal plea bargain.

## B.    Character Testimony

In addition to his own testimony and that of Cassandra Neal, applicant presented the testimony of the following three persons. Before these three witnesses were called to testify, applicant's counsel sent each of them copies of (1) the committee's response to the application that applicant filed in this proceeding, (2) the committee's pretrial statement, and (3) applicant's pretrial statement so that they would know what the allegations against applicant are.

### 1.    Victoria Curtis

Victoria Curtis (Curtis), a law student, met applicant in August 1995 during an orientation session at San Francisco Law School. Curtis corroborated applicant's and Neal's testimony regarding applicant's leadership in his law fraternity and his participation in establishing a tutorial program, a library of study aids, and a food drive for the poor. According to Curtis, applicant initially "was very gregarious, outgoing, very upbeat, knew everybody in the school." However, by the second year, applicant "had a lot of problems," "seemed [a] lot more withdrawn, very serious, toned down quite a bit," and "was having health problems."

After respondent graduated from law school in 1997, he and Curtis have had lunch together a couple of times and speak on the telephone "probably every couple of months or every quarter." Curtis has seen applicant "grow up" during the four years she has known him. Curtis believes that applicant is of good moral character and would hire him as her attorney. She finds him to be honest, trustworthy, respectful, a teacher, and a mentor.

Although she was aware that applicant sprayed a woman with pepper spray, she was surprised to learn that there was an allegation that applicant had also sprayed a child.

Applicant had told her that when he went to serve some legal papers, a woman "kind of went crazy and started to attack him, and then he said he pepper sprayed [her]." Yet, applicant never told her that a man (i.e., Stinnett) was also involved in the incident. According to Curtis, applicant never admitted guilt to the criminal charges, but he did say he was sorry and was concerned it would affect his ability to get a law license.

### 2.    Dafna Levi

Dafna Levi, applicant's wife, has known him since 1986. They were married in 1986. She is an attorney; she was admitted to the practice of law in California in 1995. She explained that applicant had a hard transition when they moved to California from Israel. The culture is different here. Applicant left an environment where everyone was aggressive, but were not perceived as being aggressive.

After the injunction was issued against him in the Dahlberg-Martincheck matter, it finally hit home that his actions were aggressive. Applicant seemed to calm down after that. Dafna Levi believes that applicant really wants to help people who are less fortunate than he.

She testified that applicant has excellent moral character and that he is honest, very caring, very considerate, and compassionate towards other people. She finds that he is very forthright, very charitable, very dependable, and has a lot of respect for the law. Even though we are aware that she is applicant's wife and might, therefore, be biased in his favor, we find Dafna Levi's testimony to be very credible.

### 3.    James Miles

Attorney James Miles testified that he and applicant are good friends. Applicant worked as a law clerk for him. It was applicant who got him involved in the Homeless Advocacy Project. He believes that applicant is of the highest moral character, honest, hard

working, forthright, caring, intelligent and trusting. He feels that applicant would be an excellent attorney. He has seen a gradual change in applicant from angry to less angry.

## C.    Charitable Works

Applicant's evidence of his extensive charitable works and involvement in civic activities, as outlined above, are strong evidence of both good character and rehabilitation. (*In the Matter of Distefano, supra*, 1 Cal. State Bar Ct. Rptr. at p. 675 [charitable works are evidence of rehabilitation].)

## D.    Psychological Counseling

Applicant sought the help of Dr. Jude Sharp, a clinical psychologist, in January 1997, due to legal problems he found himself involved in and because he was fearful that this would jeopardize his Bar application and his immigrant status. Applicant was diagnosed as having a chronic adjustment disorder with anxiety and depression. He had difficulty adjusting to existing situations and stressors (i.e., cross-cultural stressors, adjustment to different places). He suffered from impairment in social functioning and excessive reaction to an identifiable stressor or stressors.

Sharp testified that applicant's depression has decreased and is improving and making progress, but his anxiety features are still present.

She recounted the following incidents. On April 14, 1997, applicant verbally abused her receptionist without cause. We reject applicant's claim that the improper verbal exchange was mutually provoked. As to Pishgar's incident, applicant first claimed and told Sharp that he was the victim. Later, he told her that his conduct was inappropriate, but claimed that the provocation was mutual (a claim we reject). Applicant engaged in an angry encounter with an operator with Sharp's answering service. The operator told applicant that Sharp was not available, but applicant insisted on speaking to Sharp immediately. The operator felt abused verbally, and she was upset by applicant's actions.

39

Applicant claims that there was a mutual animosity between applicant and Dahlberg without any real evidence. Applicant admitted to Sharp that he was relieved about the outcome of the criminal case, but still thinks he got "screwed." Sharp indicated that these were setbacks, but the setbacks suffered by applicant into 1999 were part of his progress. She finds him to be more insightful, more aware of how his behavior affects others, more aware of how his behavior might be perceived, and more aware that conduct has consequences, which apply to him as well. She finds that he manages his anger much better and is less uptight, is a lot calmer, and has a sense of humor about himself.

She acknowledged applicant's pattern of attempts to shift blame onto others (e.g., his assertion that he was the victim in the Pishgar assault incident, that Dahlberg and he had mutual animosity, that the incident with the operator was mutually provoked, and that he was "screwed" in the criminal case).

The hearing judge found Sharp's testimony at trial to be objective and reliable, providing insight into applicant's problems and his ability to cope with them. We agree. Thus, we give substantial weight to Sharp's testimony at trial that applicant still suffers from his diagnosed disorder. While the probative value of Sharp's July 2000 letter is limited (see discussion above in footnote 4), we do give weight to her opinions expressed in it that applicant continues to make steady progress in his therapy and in applying the anger management tools he has learned. In addition, her statement in that letter to the effect that applicant has acknowledged the need to modify his attitude and conduct is positive evidence regarding applicant's attempts towards rehabilitation. However, this evidence does not establish that respondent no longer suffers from his diagnosed mental disorder.

## E.    Conclusion On Applicant's Rehabilitation Case

Applicant's evidence of rehabilitation is weak and insufficient to establish that he is rehabilitated from the substantial and extensive misconduct that we have found. Most

notably absent from applicant's rehabilitation case is <u>any</u> wide-ranging favorable testimony from acquaintances, neighbors, friends, associates, or family members who have personally observed applicant's <u>daily</u> conduct and mode of living. (Cf. *In re Andreani* (1939) 14 Cal.2d 736, 749-750 [positive testimony as to a disbarred attorney's daily conduct and mode of living is <u>highly</u> relevant to issue of rehabilitation].)

As the hearing judge aptly held, applicant's past misconduct raises serious issues as to his reliability and ability as a lawyer to handle serious affairs in an appropriate and non-violent or abusive manner, and applicant's lack of candor is a major concern. Most notable is the fact that applicant committed virtually all of the found misconduct after he entered law school, when he should have "understood that such conduct was offensive and could jeopardize his ability to practice law." (*In re Gossage, supra,* 23 Cal.4th at p. 1101.) Furthermore, this fact was expressly called to his attention not just by opposing counsel Dahlberg, but by a United States District Court Judge and a Superior Court Commissioner. Yet, applicant was either unwilling or unable to conform his conduct to the standards of the legal profession or to societal rules.

Applicant has also clearly proven to this court by his pleadings in the Safeway lawsuit and briefs on review in this court that he lacks the intellectual integrity that is so very necessary in an attorney as an officer of the court. He easily proffers meritless arguments by citing partial quotes to omit the parts that are detrimental to his position. Then, when confronted, he attempts to rationalize his conduct by admitting that it was a mistake, but claiming that it was a minor mistake innocently made or made out of ignorance of the law. He has also argued that, even if his argument is not legally correct, it is "factually" correct.

Considering the seriousness of applicant's misconduct and its pertinence to his fitness to practice law as well as his lack of candor, respect for the law, and respect for the rights of others, he must present substantial evidence of rehabilitation. At a minimum, such evidence

41

must include a significant period of exemplary conduct. (See, generally, *In re Gossage, supra,* 23 Cal.4th at p. 1099 [little weight is given to exemplary conduct while an applicant is under the supervision of parole authorities or after the applicant has applied for admission, as good conduct is expected from such individual].)

## V. Conclusion

After independently reviewing the record, we conclude that applicant Simon S. Levi made a prima facie showing that he possesses the requisite good moral character for admission to the practice of law in this state, that the Committee of Bar Examiners rebutted applicant's prima facie showing by clear and convincing evidence, but that applicant failed to establish that he is rehabilitated from the misconduct that was found to rebut his prima facie showing of good moral character. Accordingly, we hold that applicant has failed to establish that he currently possesses the requisite good moral character for admission to the practice of law in the State of California. (Bus. & Prof. Code, §§ 6060, subd. (b), 6062, subd. (a)(2); Rules Regulating Admission to Practice Law, rule X.)

WATAI, J.

We concur:

OBRIEN, P. J.
STOVITZ, J.

42