**EXHIBIT 4**

NOT DESIGNATED FOR PUBLICATION



**FILED**

SEP 1 6 2005

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

## REVIEW DEPARTMENT OF THE STATE BAR COURT

In the Matter of           )    No. 02-M-12939

SIMON S. LEVI,           )    OPINION ON REVIEW

Applicant for Admission to Practice Law.   )

BY THE COURT[1]

    In 2001, in an unpublished decision which is part of the present record, this court expressed its serious concerns about the conduct of applicant, Simon S. Levi, inter alia, in attacking a woman and his lack of understanding and remorse about that incident. We found that "applicant's past misconduct raises serious issues as to his reliability and ability as a lawyer to handle serious affairs in an appropriate and non-violent or [non-] abusive manner, and applicant's lack of candor is a mjaor concern." We accordingly concluded that applicant did not have good moral character required for admission to practice law in California, and we required that he show substantial evidence of rehabilitation. (*Levi I.*) These concerns remain central to the instant proceedings.

    Applicant reapplied in 2001 for admission and the Committee of Bar Examiners (Committee) again found that he lacked good moral character. Again, applicant sought a hearing before the State

---

[1]     Before Stovitz, P.J., Watai, J. and Epstein, J.

1

Bar Court. That hearing resulted in a finding that, because of applicant's misconduct while and after enrolled in the graduate LL.M. program at Golden Gate University Law School, he had not shown rehabilitation from the acts which led to our prior finding of lack of good moral character in *Levi I.*

Applicant asserts via myriad factual, procedural and legal claims, that the evidence does not support the hearing judge's findings, that the law does not support the hearing judge's conclusions, that the hearing judge was biased and that applicant is rehabilitated. The Committee disagrees with applicant's attack and supports the hearing judge's findings and decision.

A significant definition of good moral character is the display of traits of "honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, respect for and obedience to the laws the state and the nation and respect for the rights of others and for the judicial process."(Rules Regulating Admission to Practice Law, rule X, §1; *e.g., In re Gossage* (2000) 23 Cal.4th 1080, 1095.) We have independently reviewed the record (*In re Morse* (1995) 11 Cal.4th 184, 207), and find clear and convincing evidence of applicant's continued resort to intemperate, intimidating, irresponsible and inappropriate behavior, such that we are compelled to agree with the hearing judge that applicant's efforts at rehabilitation are "unfinished and insufficient." Indeed, at the same time as he was litigating *Levi I* in this court, applicant on numerous occasions seriously disregarded the rights of others. He repeatedly harassed a student and abused the law school's e-mail communications system, sending a barrage of messages to students, some of whom did not want to receive them or who expressly objected to their content. He also launched a verbal attack against the Dean of Golden Gate Law School that was vituperative, personal and inappropriate.

Applicant's conduct in 2000 was manifestly unacceptable for someone seeking admission as an attorney in this state. Far from showing the substantial evidence of rehabilitation we required

2

in *Levi I*, applicant has shown instead that he has failed to make the requisite showing. (See *Hightower v. State Bar* (1983) 34 Cal.3d 150, 157-158.) Unquestionably, the record before us shows that for the past ten years, applicant has been unable or unwilling to conduct himself in a manner consistent with the settled definition of good moral character. We conclude that the hearing judge's ultimate decision should be adopted and we again deny the application for admission to practice law.

I. Background (*Levi I*) and Statement of the Case in *Levi II*.

As our decision in *Levi I* was unpublished, we set forth briefly applicant's background. Applicant was born in Israel, lived there through high school and served as a paratrooper in the Israeli Army. He received his honorable discharge from that service; and, in 1987, he and his wife, Dafna Levi, emigrated to the United States. Applicant learned English in Southern California, received his undergraduate degree from California State University, Northridge, in 1992, and he and his wife attended law school in the Bay Area. Applicant graduated from San Francisco Law School and passed the California Bar Examination in 1997 but was not admitted to practice for lack of the requisite good moral character.

In *Levi I*, in 2001, we upheld the decision of the hearing judge[2] who found that applicant was not of good moral character. We there determined that although applicant established a prima facie case of good moral character, the Committee rebutted that case and applicant failed to show his rehabilitation from the Committee's case. As to the rebuttal case, we found that between 1994 and 1996 and in 2000, collectively, applicant engaged in a violent, unjustified

---

[2]      The Hearing Department proceedings in *Levi I* and *Levi II* were presided over by different hearing judges. Although we adopted some findings at variance with those of the hearing judge in *Levi I*, we upheld her basic decision that applicant was not then of good moral character for admission to practice law.

physical attack on three individuals when acting as a process server and gave false testimony to the State Bar Court about this attack. He also engaged in a variety of misconduct as to a lawsuit against a large grocery company, including making misrepresentations of law to the judge assigned to the case, engaging in extortionate conduct directed at the opposing counsel, making numerous harassing telephone calls and writing numerous harassing letters to that opposing counsel and appearing once at opposing counsel's law office, where he engaged in disruptive behavior which was abusive to the law office staff. The latter conduct required opposing counsel's law office to take enhanced security measures for several days after applicant's visit. In our 2001 opinion, we noted that applicant's past misconduct occurred after entry to law school and despite that an attorney and two judicial officers pointed out that applicant's adverse conduct could jeopardize his admission to practice. Applicant's briefs on review filed before us, as well as his misrepresentations of law to the federal trial judge in the grocery company action, further called into question applicant's suitability for admission. In concluding our opinion in *Levi I*, we stated that considering "the seriousness of applicant's misconduct. . . he must present substantial evidence of rehabilitation. At a minimum, such evidence must include a significant period of exemplary conduct."

Applicant again sought admission in March 2001. The Committee denied him admission and applicant sought a hearing in this court. (*Levi II*.) The parties stipulated to much of the documentary evidence. Indeed there is little in dispute as to the essential facts that form the basis of the hearing judge's decision, which focuses on applicant's conduct in 2000 in and around the Golden Gate University Law School in San Francisco ("Golden Gate") while and just after applicant was enrolled

in a Master of Laws (LL.M.) program.[3] The hearing judge's findings of applicant's adverse conduct may be summarized under three broad categories: 1) acts of harassment directed at a female student; 2) persistent mass e-mailings to students which were perceived by many as offensive and abusive; and 3) a hostile and personal verbal attack against the Dean of Golden Gate Law School. We summarize collectively the hearing judge's findings and supporting record in these three areas:

A. Harassment toward a female student.

In January 2000, applicant met a female law student with whom he commuted to Golden Gate on rapid transit. They did not have a previous social relationship. She and applicant exchanged e-mails seeking to meet for lunch; and, in May 2000, applicant left a box of candy in the law student's school mailbox. However, shortly thereafter, applicant sent an e-mail suggesting a sexual interest in her and the female law student learned applicant was married and that he had difficulties with his bar admission because of a previous assault. On June 12, 2000, she told applicant by e-mail that in the past few weeks he made her feel very uncomfortable, requested that he cease communication with her, and stated that if applicant sent her further e-mails or forced her into a conversation with him, she would discuss the matter with a law school professor and three of the school's administrators.

---

[3]    As *Levi I* established, applicant received his law degree from San Francisco Law School by attendance between 1993 and 1997.

After this e-mail, applicant continued to pursue the law student by e-mail, personal contact, and, on August 10, 2000, by placing a two-page letter, a typed note[4] and a $200 gift certificate in her school mailbox. When applicant's two-page letter raised the prospect that he might commit suicide over his love for her, the student became visibly upset, feared for her safety and filed a sexual harassment complaint with Golden Gate against applicant as well as sought police protection.[5] Applicant testified that he was only seeking to apologize to the female law student for his advances which the law student apparently found unwelcome.

In an e-mail he sent to many others in the Golden Gate community on October 6, 2000, applicant characterized as "silly" the sexual harassment complaint of the female law student against him, and as containing many lies and misrepresentations. In that same e-mail, applicant threatened to distribute leaflets outside of the school graduation ceremonies, characterizing the female law student as a liar. In an October 11, 2000, e-mail to many others on the Golden Gate e-mail network,

---

[4]     The typed note, which the female student realized was from applicant, was composed in broken English and started with the greeting, "helo i chinees excheng student in america." In this note, applicant assumed the role of "Eric," a supposed immigrant from China who worked in a San Francisco Chinese restaurant. The note told the female law student that "Eric" was a business school student who had seen the addressee at Golden Gate. The note exhorted her to come to China with applicant and not work as a lawyer; but rather stay home, clean house and clean up after babies, while applicant worked. In the meantime, the note invited the female student to go to the named restaurant where applicant worked, ask the manager for "Eric" so that she could dine without paying. After dinner, she could accompany "Eric" to see a "Jackie Chan" film and when the lights in the cinema dimmed, "Eric" would give her "sum chocolat kises." Enclosed with this note were some Hershey chocolate kisses.

[5]     In his August letter, applicant wrote of driving to the Orinda rapid transit station (the station which the female law student used), sitting in the car in the station parking lot, listening to a song in the student's honor and proceeding to "stick a bullet in [his] head." However, applicant wrote that a more appropriate act would be to shoot himself at a point on his chest "where the sun and moon meet, shining on each other." The reference to the sun and moon referred to a tattoo applicant knew the law student wore.

6

he repeated his characterization of the "silly" harassment complaint of the female student and addressed rhetorically his concerns to the student's parents, suggesting that they had erred in how they had raised their daughter.

B. Persistent mass-mailings to law students.

In 2000, applicant did not confine his mass e-mailings to the subject of his travails with the female student. Instead, he launched a writing campaign that for many was unwanted and offensive. It continued even after the dean directed applicant to stop sending the e-mails to those using the Golden Gate network. A few examples of the many writings of applicant in the record illustrate.

On September 1, 2000, applicant sent to students on Golden Gate's on-line bulletin board a post he entitled: "Ladies, Attention – 'How to be a good wife'" Applicant introduced his post: "Here is 'How to be a good wife article' which I recently read. It has some very interesting, valid points. So read and learn..." Following this was a 10-paragraph tutorial directed at women awaiting the return of their husband to the family home after work. The points covered included the planning and preparation of a "delicious meal on time", the wife's presentation to her husband in an attractive, rested way, the assurance by the wife that the children were clean and quiet, that the house was tidied and dusted and that she allowed her husband to unwind with an appropriate beverage and other comforts. Applicant did not cite the article's source. Several students sent e-mails questioning applicant's reason for posting this article or criticizing him for posting it. To three students, applicant replied in a joint message that he did not know the article's source. He expressed amazement at the amount of hate messages he received that he had no right to post this article on the Golden Gate bulletin board. He then stated, "This is a typical cry of the neo-fascist who push the gay and femenazi agendas. They love freedom of expression, but only when it applies to their

7

causes."

One student replied to applicant on September 4, 2000, finding it absurd that applicant would

decry the hate mail in response as he must have known full well from his characterization of his

classmates as fascists and nazis that it would offend people. This student analogized applicant's

posting to a demonstration of racial bias.[6] In response, also on September 4, 2000, applicant sent

the student this reply: "I can't tell from your name if you are a he, she, it, transsexual or whatever.

Will you do us both a favor, and stop mailing personal nasty e-mail to my personal account. In the

future, I will simply delete them without even reading them. ¶ Let's be honest with each other. I

think we can both agree that, simply put, you're an idiot. And a singularly stupid one at that.

[J]udging from your flaccid attempts at writing, it's obvious you have nothing worth saying. Which

led me to believe that you were either stoned when you posted your messages, or you obtained your

education at a state prison, or SF City College. But, what's the point because you're too stupid to

comprehend that you're stupid. It is people like you, [name omitted], who gives idiots a bad name.

---

[6]     The full text of the student's message, is as follows:
"I'm new at [Golden Gate] but not new to this kind of stupid bulk email of sexist
crap–that article about being a good wife–what's the point?
    Nobody is at [Golden Gate] taking home ec[onomics] so what's your point in posting it
on [the online bulletin board] for learning purposes?...if it's a personal fantasy of yours then keep
it to yourself. I'm sure you knew full well from the fact that you label your classmates as fascists
and nazis that it would piss ppl. off, so the fact that you lament all the hate mail derived from it is
absurd.
    This is a first reaction to having read the dialogue here and the article doesn't merit any
scholarly analysis–it was all criticized throughout the last few decades by various men and
women who found social roles like the one described therein to be unbearably claustrophobic for
both genders, but I'm sure you won't bother to read any of those critiques...cuz that would be
reading fascist and feminazi propaganda.
    Maybe in due time ppl of your ilk will find the posting of articles like that as viscerally
unacceptable as being told to 'learn a few things' from reading an article geared toward non-
whites about how to be better servants and janitors."

¶ Ignoranus: A person who's both stupid and an a[**]hole. ¶ Nature abhors a moron. – H.L. Mencken. ¶ Simon Levi."

On September 5, 2000, the Golden Gate dean sent applicant an e-mail revoking his posting privileges on the Golden Gate e-mail network, based on his decision that applicant's messages were offensive, abusive and constituted attacks on the personal integrity of others, in violation of the Golden Gate Student Code of Conduct. The dean informed applicant that he was filing an informal student conduct complaint with the assistant dean. The same day, the dean sent an e-mail to all students apologizing for applicant's unprofessional and unacceptable conduct and informed the students that these offensive e-mails would be deleted. Applicant replied immediately to the dean by e-mail promising not to post anything on the Golden gate network until the dean notified him.

However, applicant persisted in sending his mass e-mails, many with sexual or homophobic connotations. On October 16, 2000, he sent an e-mail to many Golden Gate students, in which he rated the physical attributes of seven Golden Gate female students on a one-to-ten-point scale. In the same October 16 e-mail he referred to a hypothetical same-sex couple raising a child as "gay fornicators" and advocated the immediate capture of all HIV positive persons and those with AIDS and their placement in quarantine on the island of Guam.[7]

Some students requested that applicant remove their names from receiving his bulk e-mails. Applicant complied with some, but not all requests.

---

[7]    An October 20, mass e-mail written by applicant suggested placing identifying tattoos on the foreheads of HIV-positive persons. Although claiming that he was not homophobic, and that he would absolutely condemn any unreasonable discrimination against gay persons, applicant asserted, in five pages of this e-mail, under a heading, "The truth about homosexuality" that "Gay[s] live filthy, unhealthy, dangerous, unhappy, and in many cases, violent lives." He proceeded to allege a litany of instances of sexual practices exhibited by gays and also asserted that "Gay[s] prey on children."

9

C. Verbal attack against the dean.

In late September 2000, applicant was summoned to a meeting with the Golden Gate dean and given an ultimatum of voluntary withdrawal from the law school or expulsion. He was also given less than a minute to make his decision and was informed that security officers were outside to escort him off of the campus. Applicant was shocked at this ultimatum since he thought he was summoned to the dean's office to discuss the student conduct complaint that was proceeding through the school's process. Applicant left the meeting without making an election and was escorted from the campus. A few days later, applicant's wife[8] negotiated a settlement for applicant with Golden Gate and it allowed him to withdraw voluntarily from the school.

Immediately upon his egress from the school, applicant published and distributed in front of the school a flyer entitled "Did [the dean] lose his mind?" The flier recounted applicant's views that the dean treated him unjustly. Applicant called the dean a "skunk" who disregarded "procedural safeguards" so blatantly to curry favor with the "gay activists" at school, while sacrificing applicant. Applicant's flyer stated that he did not know whether the dean's actions arose because he "forgot to take [his] medication that day," because "the Viagra is not as effective as you [the dean] had hoped," or because the dean's spouse "ran away to Mexico with the poooll-man, and you [the dean] were upset that the poooll was not as clean. . . . " When applicant made these statements, he had no reason to believe that the dean had been taking any medications nor did applicant have any knowledge about the dean's marital situation.

Another of applicant's e-mails sent to many at Golden Gate was his October 11, 2000, reply to the dean. In an attachment to that e-mail, he accused the dean of violating applicant's procedural

---

[8]    Applicant's wife was admitted to practice law in California in 1995.

10

safeguards in order to kiss up to and "stick his face in the behinds of the gay activists."

After applicant's voluntary withdrawal from the law school, he continued to send abusive and hostile e-mails to many students which variously referred to the dean as a "skunk", referred to the female law student who had rebuffed him earlier as a liar and slanderer, and railed against homosexuality. Ultimately, Golden Gate's general counsel reminded applicant that he had no privileges to post on the school's system.

While applicant was seeking to resolve by settlement his threatened ouster from Golden Gate, and after he had agreed to abstain from posting e-mails on the school's network, he continued to berate the dean in fliers and e-mail messages which he posted on that network.

As a result of the conduct summarized above, the hearing judge concluded that applicant engaged in misconduct from which he failed to show rehabilitation. She found him not of requisite good moral character for admission.

D. Other findings and evidence.

The hearing judge also made findings as to two other matters which were the subject of the Committee's concern: applicant's honesty in stating on his application for admission to practice law that he had not been disciplined by a school he attended; and his actions in bringing and conducting litigation concerning Proposition 22, California's so-called "English-only" initiative. We agree with the hearing judge's determinations in both of these matters.

As to the law school discipline disclosure issue, applicant had two informal complaints lodged against him while at Golden Gate. Neither had proceeded to formal discipline; and, as noted, applicant was allowed to withdraw from Golden Gate rather than be expelled. On his application to the Committee, applicant answered Question 13.1 ("Have you ever been dropped, suspended,

expelled or otherwise disciplined by the school for any reason other than academic performance?") in the negative. The hearing judge found that applicant's answer was "truthful, technically" since he withdrew from Golden Gate and was neither expelled nor disciplined. However, the hearing judge also found that given the totality of applicant's conduct, he was not as open and straightforward as he could have been under the circumstances.

As to applicant's conduct in the Proposition 22 litigation, the hearing judge found that in May 2001, applicant sued the Governor, the State Bar, the Supreme Court, its seven justices individually and other state entities and officers claiming that they were violating the terms of the initiative by communicating with persons in languages other than English.[9]  Applicant dismissed some defendants; and, as to others, the courts ruled in their favor. The hearing judge determined that applicant's suit and his conduct of it did not reflect adversely on his moral character.

At the hearing below, an evaluation that had been prepared almost four years earlier in July 2000 was received in evidence from a psychologist, Dr. Jude Sharpe, who had observed applicant in regular meetings since January 1997. Although applicant mentioned to Sharpe some of the conduct involved in *Levi I*, there was nothing indicating that applicant had discussed with the therapist any of his conduct involved in *Levi II*. Sharpe noted that applicant had made steady progress in applying tools to reduce the effect of the issues of stress and anger management that had brought him to therapy. Sharpe had earlier diagnosed applicant as having an adjustment disorder with anxiety but reported that there was no further evidence of it or any other psychological disorder and Sharpe recommended that applicant be admitted to practice. Sharpe wrote her report based on

---

[9]    For example, applicant's naming of the State Bar as a defendant arose because the Bar translated its consumer assistance pamphlets into non-English languages.

12

applicant's self-reporting of his behavior, concluding that applicant was improving in dealing with conflict situations. The hearing judge found that at the same time as Sharpe's favorable report, applicant was embroiled in multiple acts of abusive behavior, charged with sexual harassment and sending repeated and inappropriate e-mails to Golden Gate students.

Applicant offered five character witnesses and his own testimony. Although these witnesses had high opinions of applicant's character and could support applicant's prima facie case of good moral character, the hearing judge found that they did not establish his rehabilitation as most had either known him for only the last three or four years, or had seen him in only limited situations or infrequently. Moreover, the hearing judge deemed that they were largely uninformed of the true nature of his misconduct.

Applicant testified that he had acquired a strong adherence to religious studies in the past three years and performed volunteer service for three community organizations, Stand Against Domestic Violence, Shalom Bayit (Peace in the Home), and the Child Abuse Prevention Agency. As the hearing judge observed, this evidence came solely from applicant's testimony and was uncorroborated by any witnesses who observed his work with these agencies.

Applicant attributed some of his difficulties in 2000 to the problem of sleep apnea. However, the hearing judge found that he never presented competent documentary evidence creating a nexus between it and the misconduct found.

Finally, applicant was asked at the trial below to reflect on and testify about his actions, and whether he would, in 2004, do anything differently. Although applicant expressed clear regret over his e-mail which rated the physical attributes of female students, he was quite equivocal, guarded

13

or defensive about several significant actions he took in 2000 while at Golden Gate.[10]

II. Discussion.

We discuss at the outset, applicant's many claims that the hearing judge committed error in rulings on evidence and that she was biased. We find applicant's claims unavailing. First, most of the events that are significant to a determination of the issues are undisputed, either because they were agreed to by stipulation or they were established by unassailable documentary evidence, much of which was authored by applicant. Moreover, to the extent that any of the key issues in this case turns on the weight to be given testimony, we properly give great weight to the hearing judge's credibility findings as she was in the best position to evaluate witness credibility upon weighing all the evidence. (Rules Proc. of State Bar, rule 305(a), *Franklin v. State Bar* (1986) 41 Cal.3d 700, 708.)

However, few of applicant's procedural claims merit discussion. Applicant objects to the hearing judge's refusal to allow applicant's wife to be called as a character witness or as a percipient witness concerning applicant's sleep apnea without being subjected to cross-examination by the Committee on the issue of the sexual harassment charges. In our view, the hearing judge's ruling was an appropriate exercise of her ability to reasonably control the conduct of a State Bar Court hearing.

---

[10]     When asked about applicant's use of the term "femenazi" to refer to some classmates, applicant testified that although perhaps it was not a nice term, he felt legally justified in using it. As to another e-mail he sent to many students accusing the female student who spurned his advances of being a liar, he described it as one he would not like to send but as to which he felt was appropriate at the time. When asked whether applicant would again respond to a situation he perceived as unjust by sending that message, he first sought to answer a different question but when requested by the court to answer it as asked, he testified, "I don't know what the answer is." When asked about his printed flier attacking the law school dean, applicant testified that, although he probably would not do it again, he did not see anything inappropriate about it, given all that applicant was facing at the time.

14

(E.g., *Jones v. State Bar* (1989) 49 Cal.3d 273, 287.) Parties cannot expect to present witnesses and then expect to free them from cross-examination on a topic reasonably related to their testimony in chief.

Applicant also urges that the hearing judge erred by not eliminating from the record the charges of his sexual harassment of a female law student, because he maintains that student's deposition was not completed. Essentially, the record shows that the female law student's deposition was scheduled on three occasions. In the first session, the student's counsel terminated the deposition on the ground that applicant was seeking to annoy and harass the deponent. The hearing judge granted applicant's motion to compel a further deposition of the student but the next session was not held because applicant's deposition reporter was unavailable. At the third session, a heated exchange occurred between applicant and the student's counsel and applicant terminated the deposition. We agree with the Committee that applicant could have pursued further discovery remedies which he declined to do. Accordingly, on this record, he was not entitled to the relief he seeks.

Applicant also attacks the hearing judge's impartiality by claiming that her relationship with the Golden Gate dean created bias against applicant. However, applicant has not established his claim. The hearing judge disclosed at trial that she had earlier worked under the dean's supervision while both were employed by the San Francisco Public Defender's Office. The hearing judge stated that she had not communicated with the dean about the instant matter. Applicant waived any disqualification following the hearing judge's disclosure. One week prior to oral argument before us, applicant moved that we strike the hearing judge's decision and any credibility determinations made by her because after the hearing was completed and the judge's decision filed, she traveled to China on an "Ambassador-to-Ambassador" program and the dean also participated in that program.

Applicant's highly generalized claims that impropriety occurred are without support and do not warrant the relief he requests. We also deny as unmeritorious his other pre-argument motions; i.e., to allow him to introduce evidence of passage of a professional responsibility examination, to disqualify the State Bar from continuing to represent the Committee and to strike allegations contained in the response or in the alternative to remand to the Hearing Department for the taking of additional evidence.[11]

Although the hearing judge conducted this hearing as though it were a first-time moral character proceeding, it could have been tried with the emphasis on whether applicant's conduct after his first denial of admission showed that he had been rehabilitated. This was the ultimate inquiry in another case in which an applicant had been earlier denied admission for lack of good moral character and then reapplied. (*Hightower v. State Bar, supra,* 34 Cal.3d at pp. 157-158.) However, it was not crucial which method the hearing judge used, as the ultimate question in either analysis is whether applicant is a fit and proper person for admission to practice law. (*Seide v. Committee of Bar Examiners* (1989) 49 Cal.3d 933, 937; *Hightower v. State Bar, supra,* 34 Cal.3d at p.157.)

Turning to the merits, we find that applicant's clearly demonstrated harassment of the female law student in 2000, rebutted his prima facie case in these proceedings and showed that he was not rehabilitated from the conduct which led to this court's earlier denial of admission. There was simply no justification for applicant continuing to write, threaten or seek to engage the female student in any further discourse or ply her with gifts after her June 2000 request that he refrain from doing so. The evidence shows ample reasons for this female student to be concerned for her safety and it was

---

[11]    By order filed June 17, 2005, prior to oral argument, we denied applicant's motion to receive added time for argument.

16

unfortunately reminiscent of the conduct we found to support our earlier denial of admission. We also note that applicant's later and repeated characterization of the female student's complaints as "silly" does not aid his attempt to show rehabilitation.

We find that applicant's harassment of the female student, together with inadequate evidence of rehabilitation is determinative of applicant's current proceeding for admission. We nevertheless consider his barrage of offensive and hostile e-mails to other law students in 2000 and his intemperate and inappropriate attack on the dean as additional evidence of his lack of rehabilitation. We are greatly concerned that applicant's 2000 misconduct at Golden Gate occurred *after* applicant had received his law degree, and *while* he was litigating before us his moral character issues in *Levi I*. (Compare *Seide v. Committee of Bar Examiners, supra,* 49 Cal.3d at p. 938.)

Applicant cites *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, for the proposition that after he was no longer a Golden Gate student, his mass e-mails were constitutionally protected speech. However, *Hamidi* dealt only with the question of whether the defendant in that case could be liable for the tort of trespass to chattels by sending the e-mails he did to Intel employees.[12] As the majority said in *Hamidi*, "Because we conclude no trespass . . . was shown on the summary judgment record, making the injunction improper on common law grounds, we need not address at length the dissenters' constitutional arguments." (*Id.* at p. 1364.)

Despite the limited scope of *Intel Corp. v. Hamidi, supra,* 30 Cal.4th 1342, we readily agree that applicants need not forfeit or cloister their vigorous exercise of First Amendment rights in order

---

[12]    *Hamidi* did note that other tort causes of action could lie against the employee sender of e-mails using the employer's e-mail network, depending on the proof adduced. As examples, the majority listed four torts including defamation and intentional infliction of emotional distress. (*Id.,* at pp. 1347-1348.)

to be found of good moral character for admission. (See, e.g., *Siegel v. Committee of Bar Examiners* (1973) 10 Cal.3d 156,175-176 (*Siegel*); *Hallinan v. Committee of Bar Examiners* (1966) 65 Cal.2d 447, 461-462 (*Hallinan*).)

For that reason, we emphasize the nature of applicant's actions, not the content of his communications. Thus, we find the examples of agreements made and promptly broken by applicant to refrain from posting messages on the Golden Gate network and of varying forms of harassment by him to be reminiscent of his harassment toward the female victim and others in *Levi I*. These actions by applicant cannot be justified as attempts to redress broad social inequities such as those found in *Siegel* or in the sit-in behavior in *Hallinan*. They are no more or no less actions intended as harassment and public humiliation, and they well support the conclusion that he lacks good moral character.

The important function of evaluating admission to the practice of law does not require that we disregard speech that is contrary to accepted good moral character. *Law Students Research Council v. Wadmond* (1971) 401 U.S. 154, makes clear that we may properly consider speech and conduct in deciding whether an applicant has the requisite moral character for admission to practice. The states have a great interest in regulating lawyers since they "are essential to the primary governmental function of administering justice." (*Goldfarb v. Virginia State Bar* (1975) 421 U.S. 773, 792.) The United States Supreme Court has also observed that the First Amendment does not bar laws supported by a valid governmental interest if the laws do not seek to control the speech content but incidentally limit its unfettered exercise. (*Konigsberg v. State Bar of California* (1961) 366 U.S. 36, 49-50.) Specifically in the area of bar admission, the United States Supreme Court has upheld New York's procedure that allowed its examiners to ask applicants about activities or beliefs regarding the

18

advocacy of violent overthrow of the federal or New York governments. (*Law Students Research Council v. Wadmond, supra*, 401 U.S. at p.156.)

The admissions case of *In re Converse* (1999) 258 Neb.159 [602 N.W.2d 500] (*Converse*) bears many similarities with this case, including a protracted dispute with that applicant's law school dean. Prior to his entanglement with his law school dean, Converse had written to a female assistant dean about certain issues he had with his classes and closed the letter with the hope that she got "'a full body tan'" on vacation. (*Id.* at p. 161.) Converse then turned his attention to his law school dean and accused him in a letter of trying to pull a "'fast one.'" (*Id.* at p. 162.) He also posted a list of law school professors' salaries on the student bulletin board and displayed in his law school library study carrel a nude photograph of a female posterior.

Converse also wrote to the university president that the law school dean was "'incompetent'"and sought his termination. (*Converse, supra*, 258 Neb. at p. 163.) Converse arranged on his own for an internship with a public law office and when the law school rejected it because Converse failed to follow the law school procedures for internships, Converse protested to the bar association, claiming that the dean was "'arrogant.'" (*Ibid.*) Converse threatened to file a lawsuit not only against the dean but also against other students with whom he had disputes. He admonished the students that if he sued them, they would have to report the lawsuits in connection with their own bar admission moral character reviews. Finally, Converse produced and sold a T-shirt bearing a nude caricature of the dean astride an image of a large hot dog. The scene was entitled, "'Astride the Peter Principle.'" (*Id.* at p. 164.) Converse promoted his shirts as showing the "'Deanie on a Weanie.'" In a note to students, Converse told them that he had tallied four causes of action committed by the "tricky" dean and if the students wanted to earn some attorney fees, to let Converse know so that "we

19

can go for one of these. I've kept evidence, of course." (*Id*. at p. 164.)

Converse was also shown to have abused a tenant he sued for delinquent rent as a landlord, calling her a " '[***]ing welfare bitch.' " (*Converse, supra,* 258 Neb. at p. 164.) He testified in the admission hearing that he tended to personally attack individuals "when he finds himself embroiled in controversy." In the face of Converse's First Amendment defense, the Nebraska Court held that its examining commission properly considered Converse's conduct as it bore on his moral character "even if such conduct might have been protected by the First Amendment." (*Id.* at p. 168.) To ignore conduct composed of First Amendment protected speech would unduly limit moral character investigations to academic and minimal checks for past criminal convictions. (*Id.* at p. 167.) Admission was denied because Converse lacked good moral character. The Nebraska Court held that the evidence as a whole establishing that Converse was inclined to personally attack those with whom he has disputes was a trait unacceptable to one " 'who would be a counselor and advocate in the legal system.' " (*Id.* at p. 172.) The court concluded that the record showed that Converse's character was more consistent with one who would "go outside the field of law and settle disputes by mounting personal attacks and portraying himself as the victim and his opponent as the aggressor. Such disruptive, hostile, intemperate, threatening, and turbulent conduct" reflected adversely on the admission requirements such as "honesty, integrity, reliability, and trustworthiness." (*Id.* at p. 173.)[13]

More recently see, *In re Application for Admission to the Bar* (2005) 444 Mass. 398 [828 N.E.2d 484] in which the Massachusetts Supreme Judicial Court denied an application for admission

---

[13]    The Nebraska Supreme Court noted that its result of denial of admission might have been different had Converse shown only a single incident of rudeness or lack of courtesy. However, the court found that the record showed that Converse personally attacked those who opposed him in any way, then resorted to extra-legal arenas to publicly humiliate and intimidate those opponents. (*Converse, supra,* 258 Neb. at pp. 173-174.)

based not only on that applicant's misrepresentation of his past actions but also based on his impugning the integrity of the board of bar examiners and other abusive and unprofessional examples of his statements or correspondence.

In our view, the record before us is more serious than either *Converse* or the recent Massachusetts case in view of the continued overtones of harassment that have colored applicant's conduct during these past years, beginning with the abusive conduct which led to applicant's earlier denial in *Levi I*. We detect a troubling pattern of behavior which appears to occur as applicant's reaction to disappointment or opposition.

Following the principles of *Hightower v. State Bar, supra*, 34 Cal.3d at p.157, we have looked not only at applicant's conduct of 2000 but have examined his 2004 testimony below. We are most concerned that in his 2004 testimony, applicant continues to justify several of his 2000 actions, which still shows that he is unaware of the standards of conduct expected of an aspirant for admission to practice law. We also agree with the hearing judge that applicant's character testimony does not show rehabilitation. At best, it appears that almost none of the relatively few witnesses who testified were really aware of the grounds of our decision in *Levi I* or the essence of applicant's misconduct evidenced in this proceeding and were unequipped to evaluate applicant in light of these records.

Thus, while we commend the community service activities applicant has undertaken since *Levi I*, and recognize his greater adherence to tenets of a religious life, it is clear from the record that for about 10 years, applicant has shown a manifest inability or unwillingness to conform his conduct to the minimum standards expected of an aspirant for the license to practice law, especially as to "honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, respect for and obedience to the laws the state and the nation and respect for the rights of others and for the judicial

process." (Rules Regulating Admission to Practice Law, rule X, §1; *e.g., In re Gossage, supra,* 23 Cal.4th at p. 1095.)

III. Conclusion.

For the foregoing reasons, we uphold the hearing judge's determination and find that applicant has not demonstrated that he has the requisite good moral character for certification to the Supreme Court for admission to practice law.

# CERTIFICATE OF SERVICE
## [Rule 62(b), Rules Proc.; Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of Los Angeles, on September 16, 2005, I deposited a true copy of the following document(s):

**OPINION ON REVIEW, FILED SEPTEMBER 16, 2005.**

in a sealed envelope for collection and mailing on that date as follows:

[X]    by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at Los Angeles, California, addressed as follows:

> **Simon S. Levi**
> **25-A Cresent Drive #351**
> **Pleasant Hill, CA 94523**

[X]    by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

> **Donald R. Steedman, Enforcement, San Francisco**
> **Colin Wong, Office of General Counsel, San Francisco**

I hereby certify that the foregoing is true and correct. Executed in Los Angeles, California, on **September 16, 2005.**

**Shemainee Carranza**
Case Administrator
State Bar Court